THE STATE ex rel. ARTHUR N. SAGER, Circuit Attorney, v. POLAR WAVE ICE & FUEL COMPANY, Appellant.

**Division One, June 30, 1914.**

1. **QUO WARRANTO: Fraud in Act of Incorporation: Other Grounds.** If the information charges an unlawful arrangement, agreement and understanding to lessen competition in the manufacture and sale of a commodity between seven companies which consolidated into one, the *quo warranto* proceeding to oust it of its franchises is not to fail simply because the information charges the respondent to have been duly incorporated and the State therefore estopped to deny fraud in its organization. The statute makes unlawful not only combinations made to lessen free competition which fail of their purpose, but combinations which tend to lessen free competition and in fact do lessen it.

2. ————: ————: ————: **Sufficient Information.** An information which charges that the consolidation of said seven companies in the manner hereinbefore set out was and is contrary to the laws of the State, "and was and is an arrangement and combination which tends to lessen full and free competition in the purchase and sale of ice" and since the day of its incorporation "has continued to be an arrangement and com-

bination which has wholly destroyed competition between said seven companies in the purchase and sale of "ice" and that because of said illegal arrangement great harm and injury have come to the people, etc., charges a violation of the anti-trust statute.

3. —————: **Combination to Lessen Competition: Consolidation of Companies.** Where the defendant corporation did not purchase in the ordinary and usual methods of barter and sale the assets of the seven constituent companies which went to form its capital stock, and they did not sell their good will and property to it in the usual method of barter and sale, and they had no bona-fide purchaser, but conspired together and created one of defendant, and the consolidation was effected by the stockholders of the constituent companies exchanging their stock for stock in the new, and the whole attempt at consolidation was a studied plan to place the combined strength of the seven companies into one hand, with the view of lessening competition in their business, the consolidation was an "arrangement made with a view to lessen free and full competition," and is unlawful; and the evidence showing that the arrangement did lessen full and free competition, some one of the four penalties prescribed by the statute should be imposed.

4. —————: —————: **Judgment That May Be Imposed.** The anti-trust statute of 1907 is broad enough to authorize four judgments against a corporation which has entered into an illegal arrangement to lessen free and full competition: First, ouster of corporate rights and powers, but leaving the property to follow the course of all dissolved corporations; second, ouster of corporate rights and powers, and in addition a forfeiture to the State of a part or all of the corporate property; third, a judgment ousting it of its corporate rights and franchises and a fine in lieu of a forfeiture of property; and, fourth, a fine in lieu of both ouster of corporate rights and forfeiture of property. And the Supreme Court has common-law powers, in addition to the statutory judgments, in *quo warranto* proceedings.

5. —————: —————: **Judgment: Constituent Companies Extinct: No Monopoly.** Although the defendant corporation is clearly an arrangement to lessen and stifle competition, yet if all the constituent companies which were consolidated into it have surrendered their charters and the properties cannot be distributed among them, and the evidence shows it does not exercise a monopoly, but is in active competition with other companies, it will not be ousted of its franchises, but conditional ouster will be entered, and a fine imposed, and jurisdiction retained, so that if proof is subsequently made that it is

violating the anti-trust statutes the conditional ouster may be made absolute.

6. ————: ————: ————: Punishment: Power on Appeal. The Supreme Court has the same powers to impose punishment in a *quo warranto* case appealed to it from the circuit court that it has in one originally brought therein.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields*, Judge.

WRIT OF OUSTER AWARDED (*conditionally*).

*Nagel & Kirby, McDonald & Taylor* and *Jacob Chasnoff* for appellant.

(1) The State by suing the appellant corporation and not the individuals who use its charter, has confessed all the issues in appellant's favor. *Quo warranto* to oust from a corporate charter, for reasons relating to the organization and to the right to use the charter thus obtained, must proceed against the individuals who usurp the charter. If the corporation is sued and is alleged to be duly incorporated (as in the case at bar), the propriety and legality of all matters incident to its organization are admitted. 23 Am. & Eng. Ency. Law (2 Ed.), 596, 623; State ex inf. v. Fleming, 147 Mo. 9; State ex inf. v. Fleming, 158 Mo. 567; State ex inf. v. Gravel Road Co., 187 Mo. 439; State ex inf. v. Gravel Road Co., 37 Mo. App. 503; High on Ext. Rem. (3 Ed.), 621. This admission covers every incident to the complete organization of the corporation, and is not limited to the mere issuance of its charter; thus it includes an alleged fraud upon the State in the payment of capital stock (State ex inf. v. Hogan, 163 Mo. 43), and an incorporation for the alleged purpose of acquiring the assets and business of an existing trust so as to perpetuate the unlawful combination and create monopoly (State ex inf. v. Tobacco Co., 177 Mo. 37; Feeding Co. v. People, 156

Ill. 448). For the same reason it covers the charge that there was an ineffective attempt to consolidate the seven companies into the new corporation. Under the above authorities, the rule seems firmly established that in *quo warranto* against a corporation, only acts of misuser or abuse of charter subsequent to incorporation, can be relied upon. It follows that since the information in the case at bar contains no averments of any subsequent misuse or abuse of charter, except the furthering of an alleged pre-existing unlawful combination, the State by admitting that the corporate organization was lawful, necessarily admitted also that it was not organized for the purpose of creating monopoly, and did not in and of itself tend to create monopoly, i. e., it admitted in effect that there was no pre-existing unlawful combination. It also thereby necessarily admitted that the continued existence from day to day of such a corporation did not constitute an abuse of charter, for what was lawful to begin with, could not become unlawful through mere continuance. The trial court erred in holding that the general averments of misuse of corporate powers were sufficient, without specific averments of facts constituting misuse or abuse of charter, on which to base its finding and judgment. State ex rel. v. Grimm, 220 Mo. 490; Richardson v. Busch, 198 Mo. 174; Waldhier v. Railroad, 71 Mo. 515; Hudson v. Tyler, 140 Mo. 263; Chitty v. Railroad, 148 Mo. 75. (2) The acquisition and holding by appellant of the assets and businesses of the seven old companies was not a fraud upon the State, nor unlawful as a legally ineffective effort to ''consolidate'' the corporate entities of the seven companies, because: There was no effort here to accomplish a statutory consolidation. The statutory method was not pursued, and the essential characteristics of a corporate consolidation, viz., the destruction or merging of the old corporate entities and powers into the new corporation which resulted from their union, were lacking. R.

S. 1899, secs. 1334-1336; Powell v. Railroad, 42 Mo.
63; Evans v. Interstate R. T. Co., 106 Mo. 601. The
corporate "consolidation" method is not the only ef-
fective one by which a new corporation may validly
acquire the title and right to hold the assets and busi-
nesses of other corporations. Assuming the charter
power of the new corporation to acquire, it may do so
with the consent of all the stockholders of the old com-
panies: (a) by purchase and conveyance from the old
corporations; (b) by distribution of the assets to the
stockholders of the old corporations, and purchase and
conveyance from the stockholders as individuals, or
(c) by purchase from all the individual stockholders,
as owners of the equitable title, who cause their old
corporations to convey to the new one. A purchase in
good faith by either of the above methods would be
legally·effective, provided the purpose or result did
not violate the anti-trust laws, and "purchase" as here
used includes "exchange" or acceptance "in payment
of stock." State ex rel. v. Tobacco Co., 177 Mo. 29;
Feld v. Inv. Co., 123 Mo. 603; Tanner v. Railroad, 180
Mo. 21; Buford v. Packet Co., 3 Mo. App. 168; 1 Cook
on Corp. (5 Ed.), secs. 3, 549, 641, 670, 671; Elyea
v. Salt Co., 169 N. Y. 33; Holmes & Griggs Co. v.
Holmes & W. Co., 127 N. Y. 252; Leathers v. Janney,
41 La. Ann. 1120; Hoene v. Pollak, 118 Ala. 617; In re
Lincoln Market Co., 190 Pa. St. 124; Treadwell v. Sal-
isbury Co., 7 Gray, 393; State v. Irrig. Co., 40 Kan.
96; Pingree v. Railroad, 118 Mich. 336; Heman v.
Britton, 14 Mo. App. 127. In the case at bar the method
pursued was a sale by all of the stockholders, of their
shares in the old companies, to option holders, and then
a sale by the option holders to the new company, of all
the assets of the old corporations—all in good faith,
to the end that the new corporation, having charter
power to do so, might begin business owning all the
assets of the old companies. The public policy of this
State, as expressed in the statute permitting corporate

consolidations, favors the amalgamation of the assets of several corporations and does not prevent consolidation of more than two, even under the statute. R. S. 1899, secs. 1334-1336; Jones v. Mo. Edison Co., 135 Fed. 153. (3) The manner and amount of the issue and payment of appellant's capital stock furnishes no support for this action. State ex rel. v. Wood, 13 Mo. App. 139, 84 Mo. 378; Beebe v. Hatfield, 67 Mo. App. 615. The capital stock was in effect paid in full, in cash, which became and was liable for any debts of the corporation until the latter obtained title to the assets of the seven businesses which it was organized to acquire, and which it was the associates' intent should constitute appellant's capital. The payment of corporate capital stock in cash, with the intent of the organizing associates that the particular cash should be checked over immediately for property which it was previously agreed should be transferred to the corporation as its original working capital, is compliance with our law which permits the payment of corporate capital in cash, property or labor done. The good will of a business is property and, therefore, properly receivable in payment of the capital stock of a Missouri corporation. The tangible assets, accounts receivable, and good will, transferred to the appellant by the seven companies, were of the full value of its capital stock. (4) This prosecution by the State is based upon the statutes of Missouri which prohibit all combinations or arrangements "to regulate, or fix, or maintain the prices, or to fix or limit the production of any commodity" (Sec. 8965, R. S. 1899), and all combinations or arrangements "designed or made with a view to lessen, or which tend to lessen full and free competition in the manufacture or sale of any article." Sec. 8966, R. S. 1899. These statutes are to be given a reasonable and not a literal construction. By the words combination "made with a view to lessen, or which tend to lessen full and free competition," are meant combina-

tions which are made directly with a view to, or which directly and immediately tend towards or create a potential power of monopoly, and not any and every combination, which to any extent lessens competition between the units entering into it, nor those which only indirectly and incidentally or as ancillary to lawful acts lessen or tend to lessen competition. State ex inf. v. Harvester Co., 237 Mo. 369; Telephone v. Granby Tel. Co., 147 Mo. App. 216; State ex inf. v. Oil Co., 218 Mo. 1; Euston v. Edgar, 207 Mo. 287; Finck v. Granite Co., 187 Mo. 244; Gladish v. Stock Exchange, 113 Mo. App. 733; State ex inf. v. Tobacco Co., 177 Mo. 1; State ex inf. v. Packing Co., 173 Mo. 356; State ex inf. v. Oil Co., 194 Mo. 124; Froelich v. Benefit Assn., 93 Mo. App. 383; Brewing Co. v. Belinder, 97 Mo. App. 73; State ex inf. v. Insurance Co., 152 Mo. 1; Lead Co. v. Paint Store Co., 80 Mo. App. 266; United States v. Pipe & Steel Co., 85 Fed. 279; United States v. Oil Co., 221 U. S. 1; United States v. Tobacco Co., 221 U. S. 106; Smiley v. Kansas, 196 U. S. 447; Davis v. Booth & Co., 131 Fed. 31; Traffic Assn. v. United States, 171 U. S. 505; State v. Duluth, 107 Minn. 523; Cooke on "Combinations," par. 156, note 15; 25 Harv. L. Rev., p. 53. There was no lessening of competition in the St. Louis ice market resulting from the organization of defendant company, because the units which were combined were non-competing. They did not compete, because they naturally were not competitors. Telephone Co. v. Sarcoxie, 139 S. W. 108. The mere unification of ownership of previously independent plants, though incorporation, is not in itself necessarily a violation of the anti-trust laws. Such combinations may, or may not, constitute illegal combinations, according to other circumstances than the mere fact of combination. State ex inf. v. International Harvester Company, 237 Mo. 369; State ex inf. v. Oil Co., 218 Mo. 1; State ex inf. v. Tobacco Co., 177 Mo. 1; United States v. Pipe & Steel Co., 85 Fed. 271; Mon-

tague v. Lowry, 193 U. S. 38; Swift & Co. v. United
States, 196 U. S. 375; United States v. Freight Assn.,
166 U. S. 290; Joint-Traffic v. United States, 171 U. S.
505; Securities Co. v. United States, 193 U. S. 197;
Compress Company v. Anderson, 209 U. S. 423; Wall
Paper Co. v. Voight & Sons, 212 U. S. 227; Eddy on
"Combinations," secs. 617, 620-4; Ely on "Trusts and
Monopolies," p. 34.

*Elliott W. Major,* Attorney-General, and *Charles
G. Revelle,* Assistant Attorney-General, for the State;
*Loomis C. Johnson* of counsel.

(1) The consolidation of the seven companies and
the merger of their assets in the Polar Wave Ice and
Fuel Company under the facts in evidence constitutes
a pool, trust or combination in restraint of trade and
competition in violation of the statutes and the com-
mon law in force in this State. Secs. 8965, 8966 and
8971, R. S. 1899; State ex inf. v. Ins. Co., 152 Mo. 1;
U. S. v. P. & S. Co., 54 U. S. App. 747; State ex inf.
v. S. O. Co, 218 Mo. 1; State ex inf. v. Packing Co.,
173 Mo. 450; Brew. Co. v. Belinger, 97 Mo. App. 68;
Finck v. Granite Co., 187 Mo. 268; State ex inf. v.
Harvester Co., 237 Mo. 369; State ex inf. v. Oil Co.,
194 Mo. 154; People v. Sheldon, 139 N. Y. 251; Lead
Co. v. Grote Co., 80 Mo. App. 266; U. S. v. Knight,
156 U. S. 16; People v. Refining Co., 121 N. Y. 582;
U. S. v. W. F. Assn., 166 U. S. 342; Harding v. Glu-
cose Co., 182 Ill. 551; Richardson v. Buhl, 77 Mich.
632; Dist. & Cattle F. Co. v. People, 156 Ill. 448; State
v. Neb. Dist. Co., 29 Neb. 719; Eustis v. Edgar, 207
Mo. 289. And to establish the illegality of the agree-
ment and consolidation, mutuality of stock ownership,
the relationship of the stockholders, the methods
adopted in the organization of appellant, the manner in
which the assets of the seven companies were acquired
by appellant, the business methods of the seven com-

panies prior to the consolidation, may all be taken into consideration. State ex inf. v. Harvester Co., 237 Mo. 369; State ex inf. v. Oil Co., 194 Mo. 154; State ex inf. v. Ins. Co., 152 Mo. 1; State ex inf. v. Packing Co., 173 Mo. 450; Webber v. Jackson, 79 Mich. 180; Harding v. Glucose Co., 182 Ill. 551; Richardson v. Buhl, 77 Mich. 632; Distilling & C. F. Co. v. People, 156 Ill. 449. (2) The corporate entity. The Polar Wave Ice and Fuel Company is the proper party defendant and not its organizers and its officers and directors. The appellant waived the questions of parties by going to issue. Crook v. Tull, 111 Mo. 283. Acts of misuser and abuser are properly charged against appellant in the information. Lead Co. v. Grote Co., 80 Mo. App. 266; State ex inf. v. Fleming, 142 Mo. 74; 17 Ency. of Pl. & Pr. 435. A corporation organized to perpetuate any antecedent illegal combination frequently has been recognized as the proper party respondent. Harding v. Glucose Co., 182 Ill. 551; Richardson v. Buhl, 77 Mich. 632; Dist. & F. Co. v. People, 156 Ill. 448. Whenever a corporate consolidation takes place without warrant of law, under no matter what form, there is a usurpation of franchises which the State attacks by *quo warranto* as the obvious weapon to employ. State ex rel. v. Bailey, 16 Ind. 46, 79 Am. Dec. 405; State ex rel. v. Beck, 81 Ind. 500; State ex rel. v. Turnip Co., 102 Ind. 283; Dist. & C. F. Co. v. People, 156 Ill. 488; People v. B. H. T. & W. R. Co., 12 Abb. N. C. 230. Unlawful corporate consolidation is a capital offense for artificial persons who engage in it. The judgment of corporate death to the combining companies may follow as a result of the illegal transaction. People v. Sugar Ref. Co., 121 N. Y. 582; E. L. & R. Co. v. State, 75 Tex. 434. (3) The acquisition by the respondent company of all the assets of the seven subordinate corporations was an act of consolidation and not a barter and sale; it was done in derogation of

the common law and in contravention of the statute providing the methods for the consolidation of manufacturing and business corporations (Sec. 3360, R. S. 1909), and therefore subjects respondent to the penalty of a forfeiture of its charter. Corporations, at common law, have no power to consolidate or form partnerships. N. Y. etc. Co. v. Bank, 7 Wend. 412; People v. North River, etc. Co., 121 N. Y. 582, 9 L. R. A. 33; Pingree v. Michigan Co. R. Co., 118 Mich. 314; Railroad v. Owen, 1 Tex. Civ. App. 164. The only right they acquire is by and with the consent of the Legislature and under laws enacted for that specific purpose. Pearce v. Madison, etc. Co., 21 How. 441, 16 L. Ed. 184; Ashley v. Ryan, 153 U. S. 436; Adams v. Railroad, 60 L. R. A. 33; 3 Cook on Corporations, sec. 892; State ex rel. v. Murphy, 130 Mo. 24; Carroll v. Campbell, 108 Mo. 550; Railroad v. Marion County, 36 Mo. 303; City v. Clemens, 43 Mo. 404. The method of consolidation being prescribed by statute (Sec. 3360, R. S. 1909) must be strictly followed and impliedly every other method than that is prohibited. Railroad v. Ashling, 160 Ill. 373; Adams v. Railroad Co., 77 Miss. 194; People v. North River etc. Co., 9 L. R. A. 44; Railroad v. Marion County, 36 Mo. 303; City v. Clemens, 43 Mo. 404; City v. Eddy, 123 Mo. 557; State ex rel. v. Trust Co., 144 Mo. 562. Sec. 3360, R. S. 1909, being in derogation of the common law is to be strictly construed and its terms explicitly followed by those availing themselves of its provisions. Ramsey v. Hommel, 68 Wis. 12; Ports v. Cooley, 51 Wis. 355; Mosley v. Tift, 4 Fla. 403; Beeson v. Busenbark, 10 L. R. A. 839. The acquisition of the assets of the subordinate corporation by the respondent company was an act of consolidation and not of barter and sale. It matters not by what name such acts were denominated, the law looks to the effect. Railroad v. Ashling, 56 Ill. App. 327, 160 Ill. 373; People v. North River etc. Co., 9 L. R. A. 41; Adams v. Railroad, 77 Miss. 194; Shad-

ford v. Railroad, 89 N. W. 960, 60 L. R. A. 33. The evasion of the statutory method of consolidation and the failure to follow its terms is ground for the forfeiture of respondent's charter in a *quo warranto* proceeding. Purdy's Beach on Priv. Corp., sec. 1264; Brown v. Dibeld, 65 Mich. 520; Mansfield etc. Co. v. Hunt, 26 Ohio St. 241; Railroad v. State, 155 Ind. 433; State ex rel. v. Trust Co., 144 Mo. 562.

GRAVES, J.—This is an action in *quo warranto*, instituted and tried in the circuit court of the city of St. Louis. The information is challenged and had best be set out. The cause was tried before a referee, who recommended judgment for the defendant. Upon exceptions filed by the State, the trial court disapproved the findings and recommendations of the referee, and made findings of its own, and entered a judgment ousting the defendant of all its charter rights. From this judgment the defendant has appealed. The information reads:

"State of Missouri, ⎫
                      ⎬ ss.
  City of St. Louis. ⎭

"In the Circuit Court, City of St. Louis, June Term, 1906.

"The State of Missouri, at the
  Relation of Arthur N. Sager,
  Circuit Attorney, Plaintiff,
        v.                          } Quo Warranto
"Polar Wave Ice and Fuel Company, a Corporation Respondent.

"Comes now Arthur N. Sager, Circuit Attorney, within and for the city of St. Louis, who brings this action on behalf of the State of Missouri, and for cause of action against the respondent, informs the court, that the respondent, Polar Wave Ice & Fuel Company,

is a corporation organized under the laws of the State of Missouri, and particularly article 9 of chapter 12 of the Revised Statutes of 1899; that respondent company was organized on the 13th day of February, 1903, and by its charter was authorized and empowered to manufacture, and buy and sell ice at wholesale and retail, and do all things and acts consistent with such right and authority.

"That this information further states, that respondent company, as alleged in its articles of incorporation, was organized with a capital stock of one million eight hundred thousand dollars, which was alleged in its said articles of incorporation to have been bona-fide subscribed and paid in full in lawful money of the United States, and that the said sum has been placed at the time in the custody of the persons therein named as the board of directors of respondent company; that the names of the several persons who subscribed to the capital stock aforesaid, and the amount of the stock subscribed by each, is as follows:

"Charles W. Whitelaw, 1200 shares preferred and 2400 shares of common stock; Christopher Muckermann, 1200 shares of preferred and 2400 shares of common stock; Ignatius C. Muckermann, 1200 shares of preferred and 2400 shares of common stock; John C. Muckermann, 1200 shares of preferred and 2400 shares of common stock, and Herman E. Penning, 1200 shares of preferred stock and 2400 shares of common stock, making the entire capital stock of said company; that the foregoing persons, to-wit, Charles W. Whitelaw, Christopher Muckermann, Ignatius C. Muckermann, John C. Muckermann and Herman E. Penning, were named in the said articles of incorporation as the directors of said corporation to act as such for the ensuing year, to-wit, until February 13, 1904, and as the persons in whose custody the one million eight hundred thousand dollars lawful money of the

United States, representing the par value of the capital stock of respondent company, was placed at the time said articles of association were filed with the Secretary of State, to-wit, on the 13th day of February, 1903.

"And this information further states that on or about and prior to the 13th day of February, 1903, there existed and were operated in the city of St. Louis, seven certain corporations, organized under the laws of the State of Missouri, and particularly article 9, chapter 12, of the Revised Statutes of Missouri for 1889 and 1899, to-wit: 'The American Ice and Coal Company,' 'Muckermann Ice and Coal Company,' 'Union Ice Company,' 'Creve Coeur Lake Ice Company,' 'Huse and Loomis Ice and Transportation Company,' 'Huse-Godell Ice Company,' and the Hygeia Ice Company,' hereinafterwards called and known as the 'seven companies'; that by virtue of the respective charters of the said seven companies, each was authorized to manufacture and buy and sell ice at wholesale and retail, and each of the said seven companies was, on or about the 13th day of February, 1903, and prior thereto, engaged in the manufacture, the purchase and sale of ice at wholesale and retail in the city of St. Louis.

"That prior and up to the 13th day of February, 1903, the said 'seven companies' so engaged in the manufacture and the purchase and sale of ice in the city of St. Louis, were operating under an unlawful agreement, combination and understanding, by which they jointly fixed and maintained the prices to be charged by each of them, from time to time, for ice at wholesale and retail, in the city of St. Louis, and whereby they jointly and systematically sought to control the ice trade of the city of St. Louis, against all persons, firms and corporations, who did not become and were not parties to their said agreement and understanding, and whereby they sought to prevent full and free

competition in said trade in the city of St. Louis; that the said 'seven companies' were in control of the largest portion of the ice business of the city of St. Louis, controlling over fifty per cent of the ice product of the said city and the wholesale and retail trade therein, and were by reason of that fact and the said unlawful agreement, combination and understanding between them enabled to dictate, control and fix the price of ice to consumers in said city and prevent and restrain full and free competition in such trade.

"Plaintiff further states that at the time of the organization of respondent corporation, and at the time of the execution of its said articles of association, the said Christopher Muckermann, John C. Muckermann, Charles W. Whitelaw, Herman E. Penning and Ignatius C. Muckermann were the agents respectively of the aforesaid 'seven companies,' and that Christopher Muckermann was president and John C. Muckermann treasurer of the said Muckermann Ice and Coal Company; that Charles W. Whitelaw was president and Herman E. Penning was secretary of the said Huse-Loomis Ice and Transportation Company; that Ignatius Muckermann was treasurer of the Hygeia Ice Company and that said Charles W. Whitelaw was a large stockholder in the said Creve Coeur Lake Ice Company.

"Plaintiff states that the said respondent corporation was not organized in good faith with a paid-up capital of one million eight hundred thousand dollars, lawful money of the United States, and for the purpose set out in the articles of association, as aforesaid, but that said company was organized for the unlawful purpose of consolidating the said 'seven companies,' and to more readily and easily carry out their unlawful combination, agreement and understanding to fix and maintain the price of ice and control the

trade in same in the city of St. Louis, and that in pur-
suance of said design, the said subscribers to its capi-
tal stock, to-wit, Charles W. Whitelaw, Christopher
Muckermann, Ignatius C. Muckermann, John C. Muck-
ermann and Herman E. Penning, in behalf of and as
agents of the said 'seven companies' and as incorpo-
rators for them (the 'seven companies') subscribed for
the stock of respondent companies under an agreement,
whereby the stock and the assets of the said 'seven
companies' were transferred and taken over by re-
spondent company at fixed and grossly inflated valua-
tions, in return for stock of respondent company, re-
spectively issued to each of the said companies and
their several stockholders and trustees; that in pur-
suance of such illegal consolidation or merger, the said
Charles W. Whitelaw, Christopher Muckermann, Ig-
natius C. Muckermann, John C. Muckermann and Her-
man E. Penning elected or selected themselves as di-
rectors of respondent company and at the same time
they, or so many of them as was necessary to constitute
a majority of the directors of each of the said 'seven
companies' comprising the merger or consolidation,
were elected directors thereof and became holders of
all the stock in said corporations, and as such direc-
tors directed a conveyance and transfer of all the prop-
erty of every kind and description, which the said sev-
eral 'seven companies' held, to respondent, the 'Polar
Wave Ice & Fuel Company,' and that since that time
the said respondent company has under one manage-
ment and control and in furtherance of the illegal com-
bination, agreement and understanding theretofore ex-
isting between the said 'seven companies,' carried on
the business of manufacturing and buying and selling
ice in the city of St. Louis, theretofore enjoyed, con-
ducted and maintained by the said 'seven companies'
severally and has thereby destroyed all competition as
it once existed between the said 'seven companies'
in the trade controlled and reached by them.

"That by reason of the premises, plaintiff states, the respondent company·obtained its corporate charter and authority to do business under the laws of the State of Missouri by misrepresentation and fraud, and has since its incorporation misused and perverted the powers, rights and privileges conferred upon it and is now misusing and perverting such powers, rights and privileges, and has usurped and willfully and unlawfully exercised and is now usurping and unlawfully and wilfully exercising powers, rights, privileges and franchises not conferred upon it by law, to-wit, the right, power and franchise of acquiring for its stock, and holding and owning the whole of the property of the said 'seven companies,' to-wit, 'American Ice and Coal Company,' 'Muckermann Ice and Coal Company,' 'Union Ice Company,' 'Creve Coeur Lake Ice and Coal Company,' 'Huse and Loomis Ice and Transportation Company,' 'Huse-Godell Ice Company,' and the 'Hygeia Ice Company,' and causing a nonuse of their franchises in such a manner as to·put said corporations and their properties and rights under one management and control and destroy all separate and distinct control of said several companies and all competition among them.

"Plaintiff further states, that said consolidation of said 'seven companies' in the manner hereinbefore set out was and is contrary to the laws of the State of Missouri, and was and is an arrangement and combination which tends to lessen full and free competition in the purchase and sale of ice in the city of St. Louis, and since the 13th day of February, 1903, has continued to be an arrangement and combination which has wholly destroyed competition between the said 'seven companies' in the purchase and sale of ice in the city of St. Louis; that said unlawful arrangement has continued from the 13th day of February, 1903, to the time of the bringing of this suit and was in full

force and effect from the 1st day of August, 1904, until the time of the bringing of this action, to-wit, for a period of seven hundred and twenty-one days.

"That by reason of the illegal acts, conduct and arrangement on the part of respondent company, hereinbefore set out, great injury, harm and damage has come to the people of the city of St. Louis and the people of the State of Missouri, and defendant has forfeited its right and franchise to carry on business under the laws of the State of Missouri.

"Wherefore plaintiff prays that the charter granted respondent, 'Polar Wave Ice and Fuel Company,' be held and declared to be null and void, and that judgment be rendered against respondent in favor of plaintiff for the sum of one hundred dollars per day, from the 1st day of August, 1904, to the 21st day of July, 1906, in the total sum of seventy-two thousand one hundred dollars, and for costs."

To this information return was made in this language:

"Now come Polar Wave Ice & Fuel Company, respondent herein, and for its answer to the complaint says that it is true that this respondent is a corporation organized and existing under the laws of the State of Missouri, and particularly under article 9 of chapter 12 of the Revised Statutes of 1899; and that said respondent was organized on the 13th day of February, 1903, and was by its charter authorized and empowered to manufacture, buy and sell ice at wholesale and retail, and to do all things and acts consistent with such right and authority.

"And this respondent says that it is true that it was organized with a capital stock of one million eight hundred thousand dollars, which was alleged in its said articles of incorporation to have been bona-fide subscribed and paid in full in lawful money of the United States; and that the said sum had been placed at the time in the custody of the persons therein named as

the first board of directors of respondent company; that the names of the several persons who subscribed to the capital stock aforesaid and the amount of the stock subscribed by each, is as follows:

"Charles W. Whitelaw, 1200 shares preferred and 2400 shares of common stock; Christopher Muckermann, 1200 shares of preferred and 2400 shares of common stock; Ignatius C. Muckermann, 1200 shares of preferred and 2400 shares of common stock; John C. Muckermann, 1200 shares of preferred and 2400 shares of common stock, and Herman E. Penning, 1200 shares of preferred stock and 2400 shares of common stock, making the entire capital stock of said company; that the foregoing persons, to-wit, Charles W. Whitelaw, Christopher Muckermann, Ignatius C. Muckermann, John C. Muckermann and Herman E. Penning, were named in the said articles of incorporation as the directors of said corporation to act as such for the ensuing year, to-wit, until February 13, 1904, and as the person in whose custody one million eight hundred thousand dollars lawful money of the United States, representing the par value of the capital stock of respondent company, was placed at the time said articles of association were filed with the Secretary of State, to-wit, on the 13th day of February, 1903.

"And further answering, this respondent denies each and every other allegation in said complaint contained, and says that its organization and incorporation was properly and regularly had, as is in said complaint alleged and in this answer admitted; and this respondent denies that its said organization and incorporation can be dissolved at the instance of plaintiff herein upon the allegations which are in his said complaint contained, and says that the money value of the loss of the respondent, if its charter be forfeited as prayed in the petition, will exceed the sum of one hundred thousand dollars.

"Wherefore, having fully answered, this respondent asks to be hence discharged with its costs."

The above are the pleadings. The facts furnish interesting reading. Prior to 1879 there was in St. Louis the firm of Muckermann Brothers, engaged in the retail sale of ice and perhaps fuel. Their stock in trade was rather limited, but they covered (in business) the city, both North and South. The firm was composed of Chris and John Muckermann. In 1879, this firm was dissolved, but each partner remained in the ice business. Chris Muckermann took the south St. Louis business of the firm upon their division of property and territory, and John took the North St. Louis territory. Thus early competition was stifled by dividing territory. Afterward competition grew up between these parties, but all to be allayed in the near future. It would appear that Chris Muckermann was the more alert and thrifty of the two. In 1879, upon the division of the firm assets, Chris was left with an ice house at 3725 North Fourteenth street, a small stable and dwelling and two ice selling routes in South St. Louis. In about 1889, Chris Muckermann incorporated his business under the name of Muckerman Ice & Coal Company.

In 1888 the Muckermanns (Chris and his sons) were doing business in the west end. In hot competition with them were four other dealers. Chris, however, conceived the plan of going into the corporation business, as well as the ice business, and the result was the organization of the Polar Wave Ice Company, in which all these interests were combined, and in which Chris then held twenty-five per cent of the stock. Business acumen gave him larger interests later. With the birth of this new corporation came an alignment of territory and the fixing of a dead line over which neither should go. That dead line was Jefferson avenue. To the west was Polar Wave territory, and to the east Muckermann territory. In 1889, Chris incorporated

his individual business as above indicated. In 1891, Medanich, Schulte, and the Muckermanns were all competitors in another distinct portion of the city. The result was the organization of another corporation, the American Ice Company, in which Chris Muckermann and two of his boys, I. C. and J. C., were interested.

Finally, and as fourth in line, Chris Muckermann and two of his sons and John Muckermann and two of his sons, organized the Union Ice Company. It was well named, for it brought together that which had been severed in 1879 when Chris and John, the two brothers, had dissolved the firm of Muckermann Brothers. But its name "Union" has even deeper significance than the mere uniting of property interests. It meant the union of strength in an effort to stifle competition. Thus steadily had Chris Muckermann grown from two small routes in south St. Louis in 1879, until he and his folks controlled four corporations covering the greater portion of the city. The great weight of the testimony shows that these four corporations did not compete with each other in the ice business. By direction of the Muckermanns each stayed within the fixed terminal lines. That the four operated as one and had one common advisor is shown by the fact that, in 1901, the officers met and agreed to raise the price of ice from thirty-five cents per 100 to fifty cents per hundred. Each corporation so raised it. Later the word was passed around to lower the price and it was lowered. These four corporations can well be styled the Muckermann Companies, for they were in truth and fact Muckermann Companies, domineered and controlled by the Muckermanns. In the retail ice business they did not compete with each other. They stayed within fixed territory agreed upon at the several dates of organization.

Going now to the respondent in this case, i. e., The Polar Wave Ice and Fuel Company. Besides the four corporations above described, there were doing

business in St. Louis three wholesale ice companies, i. e., Huse-Loomis Ice and Transportation Company, Huse-Godell Ice Company and Creve Coeur Lake Ice Co. The date of incorporation and capital stock of the seven companies at the formation of the respondent were as follows:

### WHOLESALE.

| Name. | Date of Incorp. | Capital |
|---|---|---|
| Huse-Loomis Ice & Transportation Co. | Jan. 10, 1882 | $550,000 |
| Huse-Godell Ice Company | Dec. 28, 1887 | 50,000 |
| Creve Coeur Lake Ice Co. | Sept. 27, 1880 | 50,000 |

### RETAIL.

| Name. | Date of Incorp. | Capital |
|---|---|---|
| Polar Wave Ice Co. | Mar. 8, 1888 | $75,000 |
| Muckermann Ice & Coal Co. | Dec. 6, 1889 | 20,000 |
| American Ice Company | Feb. 7, 1891 | 30,000 |
| Union Ice Company | Dec. 15, 1892 | 20,000 |

The companies were officered at the same time as follows:

Huse-Loomis Ice & Transportation Co.

President ............... Chas. W. Whitelaw,
Vice-President ................. Wm. Loomis,
Secretary .................... H. E. Penning,
                              Luther Loomis,
                              Geo. F. Foster,
                                Five Directors.

Huse-Godell Ice Company.

President .............. Chas. W. Whitelaw,
Vice-President ................ L. W. Godell,
Secretary & Treasurer ........ H. E. Penning,
                              Three Directors.

Creve Coeur Lake Ice Company.

President ................ Chas. W. Whitelaw,
Vice-President .............. Chas. E. Poppe,
Secretary and Treasurer ... Dwight Hartwell,
                              Three Directors.

Polar Wave (Hygeia) Ice Co.

President ................ Chris Muckermann,
Vice-President ........... Chas. W. Whitelaw,
Secretary ................... H. E. Penning,
Treasurer ................ I. C. Muckermann,
                          J. C. Muckermann,
                                    Five Directors.

Muckermann Ice & Coal Company.

President ............... Chris Muckermann,
Vice-President & Treasurer   J. C. Muckermann,
Secretary ................. Joe Muckermann,
                                    Three Directors.

American Ice & Coal Company.

President ................. Thos. Medanich,
Vice-President .............. Jos. Medanich,
Secretary ................... J. C. Sanders,
                                    Three Directors.

Union Ice Company.

President .............. Chris Muckermann,
Vice-President & Treasurer .. Wm. Winkler,
Secretary ................ J. C. Muckermann,
                                    Three Directors.


Before the birth of respondent, the Polar Wave Ice Company changed its name to the Hygeia Ice Company. The name ''Polar Wave'' was to be reserved in all its purity and bleakness for the anticipated newborn. Looking over the list of officers, the wholesale companies for convenience may well be called the ''Whitelaw companies,'' and the retail companies the ''Muckermann companies.'' It is apparent that Whitelaw as thoroughly dominated the one class, as did the Muckermanns the other. For convenience we will so name the interests. In 1903, I. C. Muckermann, son of Chris Muckermann, seems to have been the leading spirit in the Muckermann interests, and Whitelaw occupied a like position with the wholesale companies. These two spirits got together, having in view both a

wholesale and retail ice business. The Muckermann companies did but little manufacturing or harvesting of ice. The others were practically solely engaged in manufacturing and harvesting ice. The result was the incorporation of the respondent, Polar Wave Ice & Fuel Company, with a capital stock of $1,800,000. The method was this: Each of the seven separate corporations procured from their respective stockholders a written agreement in this form:

"This Agreement, made this — day of January, 1903, by and between Luther Loomis, and all other persons holders of stock in the Huse & Loomis Ice & Transportation Company, who may sign this contract, parties of the first part, and Charles W. Whitelaw, of the city of St. Louis, Missouri, party of the second part, and St. Louis Union Trust Company of St. Louis, trustee, party of the third part, Witnesseth, That:

"Whereas, it is proposed by certain stockholders in the existing corporations hereinafter named, to form a new corporation, to be known as the Polar Wave Ice & Fuel Company (or by some other name that may be selected) ; and,

"Whereas, it is proposed to so organize said corporation that it may purchase, hold and operate the assets and business at present owned and operated by the following corporations, all of St. Louis, Missouri, and all organized under the laws of the State of Missouri, to-wit: Huse & Loomis Ice & Transportation Company, Creve Coeur Lake Ice Company, Huse-Godell Ice Company, Polar Wave Ice Company, American Ice & Coal Company, Muckermann Ice & Coal Company and Union Ice Company; and,

"Whereas, it is proposed that the said new corporation shall have full paid capital of $1,800,000, its capital stock consisting of $600,000 preferred and $1,200,000 of common stock, said preferred stock to be six per cent cumulative stock, preferred as to both principal and income, and that said corporation, when

organized, shall purchase all the assets, properties and business of all of said corporations at and for the price of $1,800,000, and after said purchase shall acquire by gift and shall own as treasury stock not less than six hundred shares of said preferred stock, aggregating in face value sixty thousand dollars, and also not less than fifty thousand dollars face value of its common stock; and,

"Whereas, it is desired by this contract to give an opportunity to holders of stock in the Huse & Loomis Ice & Transportation Company to consent to and further the proposed amalgamation of all of said properties, and to exchange their present holdings of stock in the Huse & Loomis Ice & Transportation Company for preferred stock in the new corporation, and on the basis and upon the conditions hereinafter stated:

"Now, therefore, in consideration of the premises and of the sum of one dollar paid to each of the parties of the first part, and of the mutual agreement and trust hereinafter stated, it is hereby mutually agreed between the respective parties hereto as follows:

"First: Each of the parties of the first part, in signing this contract, binds himself only, and merely as to the stock for which he signs, and does not assume or incur any liability for the undertakings of any other parties of the first part.

"Second: Each of the parties of the first part agrees on demand of the trustee (after holders of all stock in the Huse & Loomis Ice & Transportation Company have signed this contract) to deposit with the party of the third part, as trustee, certificates, indorsed in blank for transfer upon the books of the company, evidencing the respective number of shares of stock in the Huse & Loomis Ice & Transportation Company, for which they have signed this contract, for which deposits the said trustee will give its receipts; said certificates to remain in the possession of the trustee during the term of the option granted by this contract,

unless they have sooner been disposed of according to further provisions hereof.

"Third: Each of the parties of the first part hereby grants to the party of the second part an exclusive option during sixty days from the date of this contract, to purchase the stock hereby signed for, at a price to be paid in full-paid preferred stock in the new company, if organized, as above recited—said price to be determined by estimating the exchange value of the stock in the Huse & Loomis Ice & Transportation Company at eighty dollars per share, and of the preferred stock in the said new company, at par, $100 per share, i. e., each share of stock in the Huse & Loomis Ice & Transportation shall be considered as worth $80 on account of the purchase of one share of preferred stock in the new company.

"Fourth:   Each of the parties of the first part hereby constitutes and appoints the party of the second part as proxy, giving him power during the period of the option granted in the last section of this contract, to vote the shares of stock hereby signed for, at any meeting of the stockholders of the Huse & Loomis Ice & Transportation Company, for the purpose of authorizing the directors and officers of the Huse & Loomis Ice & Transportation Company to sell, transfer, convey and deliver all of its assets, together with its good will, to the proposed new company, as well as for other purposes; the proxy hereby granted, however, is upon condition that the second party shall not exercise the same until he has obtained a contract with the new company and the holders of all its stock, by the terms of which there shall be deposited with the third party, in trust for each of the first parties, such stock in the new company as each of the first parties is to receive under this contract, said deposit of new stock to be made upon the transfer of the assets of all of said existing companies.

"Fifth: It is mutually agreed that upon the deposit with the third party, in trust for each of the first parties, of the respective numbers of full-paid shares of the kind of stock in the new company to which each is entitled under this contract, the trustee shall, and will, deliver to the second party, or his order, the certificates of stock in the Huse & Loomis Ice & Transportation Company theretofore deposited with it by the respective parties of the first part, and will thereupon deliver to the respective first parties the said certificates of stock in the new company deposited with it for each, as above provided. Upon making of such delivery the duties of the trustee shall be at an end.

"Sixth: The signature of each of the first parties to this contract is upon condition that this contract is not to become or to be binding upon any signer unless the holders of all of the stock in the Huse & Loomis Ice & Transportation Company sign the same.

"Seventh: It is understood and agreed that all holders of stock in the Huse & Loomis Ice & Transportation Company are to receive preferred stock in the new company in exchange for their present holdings, except Charles W. Whitelaw, who has consented to accept common stock of the new company on the same basis of value, i. e., each share of his present stock to pay $80 on account of one share of common stock of a par value of $100 in the new company, and that he is also, through the amalgamation of all of said assets and their acquisition by the new company, to receive additional shares of common stock in the new company, in compensation for his services in accomplishing the consolidation above referred to.

"Eighth: If the sale and exchange of stock provided for in this contract is not consummated within the said sixty days, then at the expiration of that time the third party shall, and will, return to each of the first parties the respective shares of stock in the Huse

& Loomis Ice & Transportation Company, theretofore deposited with it under this contract.

Ninth: The obligations, powers and rights resulting from this contract shall be binding upon and shall operate in favor of the respective legal representatives, assigns, and successors in trust of the parties hereto.

"In witness whereof, the parties have signed this contract the day and year first above written."

The only difference in the contracts were the dates, the parties and the value of the shares. We shall not set out at length the other instruments of writing gone through with in the evolution of the respondent. Suffice it to say, that the parties interested, on February 11, 1903, gave their note for $1,800,000 to the Union Trust Company and received credit on the books of the Trust Company for that amount. On the 13th day of February these same parties gave their check on the Trust Company to the newborn, the Polar Wave Ice & Fuel Company, for $1,800,000, and that company got a book credit for that sum, and the other parties were debited with a like sum, thus leaving their account square. Then the new corporation gave the same makers of this note its check for $1,800,000 and received from them deeds from the seven old corporations of all their holdings, except their charter. Thus the new corporation was left with no funds after its account had been debited with its $1,800,000 check. The makers of the note were not going to be outdone in promptness of liquidating paper debts, and they on the same day gave their check on the Union Trust Company to the Union Trust Company for $1,800,000, and took up their note. Nobody saw any money and the records fail to disclose any interest paid. The stock in the new corporation was then distributed by the several trustees named in the contracts to the stockholders of the old corporation in accordance with the rate and ratio fixed in the several contracts. The unit of transfer was the new stock at face value. In two

of the old companies $100 in stock only paid $75 in new stock, whilst in others the old stock was taken in as high as $7 to $1. In other words, $1 of old stock would pay for $7 of new. In this fashion the respondent was born and started out upon its successful business career. We say successful, because in the course of a few years it had not only paid six per cent dividends upon its stock, but had charged off of its books, and replaced in cash, nearly a half million dollars, which was the "Good will" of the old companies, capitalized in the new corporation. Not only so but it invested large sums in new equipment and property, the details of which may be referred to in the course of the opinion.

There is some evidence that after the organization of the respondent it threatened to and did kill off one competitor by reducing prices, and thus getting the consumers. This sufficiently outlines the case. Details will come in the course of the opinion.

I. Appellant's first contention is thus stated.

"*Quo warranto* to oust from a corporate charter, for reasons relating to the organization and to the right to use the charter thus obtained, must **Corporation: Fraud in Organization.** proceed against the individuals who usurp the charter. If the corporation is sued and is alleged to be duly incorporated (as in the case at bar), the propriety and legality of all matters incident to its organization are admitted."

For the purposes of this case we might grant all that is here claimed. Counsel starting from this corner-stone then proceed, to their own satisfaction at least, to show that the whole case for the State falls with this concession. Grant it that the State, by charging the due incorporation of the appellant, would be estopped from challenging fraud in its incorporation, yet that would not end the case, because there are other vital matters in the information before us. This

information (and we have set it out in full, so that it may speak for itself) when fairly analyzed, charges at least three things: (1) a fraudulent incorporation of appellant, (2) a consolidation of seven existing corporations in violation of our statutes with reference to consolidating corporations, and (3) an unlawful arrangement, agreement or understanding to lessen competition in the manufacture and sale of ice. Appellant disclaims that there was any attempt to consolidate corporations under the statute, and we think there was none. Nor need we go into the alleged fraud in the organization of the corporation. We shall take the case upon the third ground of the petition, and discuss it from that point solely, and only mention its method of incorporation as it bears upon the real question in issue. This information will be measured by the statute, and when so measured, we think the language used is broad enough to cover the third proposition stated, supra. This matter we discuss in the next paragraph.

II.    That the information in this case is broad enough to bring it within the terms of our anti-trust statute is clear from the following language used therein:

"Plaintiff further states, that said consolidation of said 'seven companies' in the manner hereinbefore set out was and is contrary to the laws of the State of Missouri, *and was and is an arrangement and combination which tends to lessen full and free competition in the purchase and sale of ice in the city of St. Louis, and since the 13th day of February, 1903, has continued to be an arrangement and combination which has wholly destroyed competition between the said 'seven companies' in the purchase and sale of ice in the city of St. Louis; that said unlawful arrangement has continued from the 13th day of February, 1903, to the time of the bringing of this suit and was in full*

*force and effect from the 1st day of August, 1904, until the time of the bringing of this action, to-wit, for a period of seven hundred and twenty-one days.*

"That by reason of the illegal acts, conduct and arrangement on the part of respondent company hereinbefore set out, great injury, harm and damage has come to the people of the city of St. Louis, and the people of the State of Missouri, and defendant has forfeited its right and franchise to carry on business under the laws of the State of Missouri."

The italics are ours. The statute involved it was my pleasure to analyze and discuss in State ex inf. v. International Harvester Co., 237 Mo. l. c. 405. In that case, after setting out the statute in full, I said:

"The part to which I desire first to apply the facts in this case, stripped of all useless verbiage, would read:

" 'All arrangements, contracts, agreements, combinations or understandings made, or entered into between any two or more persons, designed or made with a view to lessen, or which tend to lessen . . . full and free competition in the sale . . . in this State of any product, commodity or article, or things bought and sold . . . are hereby declared to be against public policy, unlawful and void; and any person or persons creating, entering into, becoming a member of or participating in such arrangements, contracts, agreements, combinations or understandings shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and punished as provided for in this article.'

"The punishment is fixed by section 10304, which follows in the article.

"It will be noticed that our statute is exceedingly broad. It includes not only contracts, agreements and understandings, but also all arrangements and combinations. It includes not only all those things which tend to lessen full and free competition, but likewise

all those things which were done with the view of lessening full and free competition. In other words, this statute punctuated and worded as it is, covers two classes of 'arrangements, contracts, agreements, combinations and understandings'; i. e., (1) those that were made 'with the view to lessen . . . full and free competition,' but which may have never been so operated as to reach the result had in view or in mind; and (2) those made 'which tend to lessen . . . full and free competition' and which in fact did lessen competition.

"I repeat that this statute when fairly analyzed thus resolves itself, so far as the question under discussion is concerned. The several clauses purposely placed therein by the lawmaking power do not mean one and the same thing, but were put there purposely to be far reaching in effect. It was intended to reach all conceivable methods which might be designed by shrewd 'captains of finance.' The purpose of the statute was to thwart action in the very incipiency, as well as all down the line. It was designed to reach all arrangements, etc., which were designed and made with the view of lessening competition, as well as those which in fact did that thing. Either class falls equally under the ban of the statute—one no more nor less than the other."

The information in the case at bar in addition to other reasons assigned for the taking of appellant's charter, does assign as a reason that the very organization of appellant was such as to make it an unlawful "arrangement" "to lessen full and free competition" in the sale of ice. Note the language of the information, "*and was and is* [the organization of appellant as a corporation] *an arrangement and combination which tends to lessen full and free competition in the purchase and sale of ice*" etc. This feature of the information counsel for appellant overlook and ignore. To my mind it stands out over and above all other mat-

ters charged therein, and we therefore leave other questions for the discussion of this one paramount question, i. e., was the organization and incorporation of the appellant an unlawful "arrangement" made with the view of lessening competition in the purchase and sale of ice in the city of St. Louis? Was it an arrangement condemned by section 10301, Revised Statutes 1909 (formerly section 8966, Revised Statutes 1899), which statute is analyzed and outlined above? We think so. The organization of appellant was not unlike that of the celebrated International Harvester Co., 237 Mo. l. c. 407. The appellant did not purchase the assets of the seven constituent companies in the ordinary and usual business methods of barter and sale. Nor did the seven constituent companies sell their good will and property in the usual method of honest barter and sale. These seven corporations had no bona-fide purchaser, but from pure selfish, wrongful and unlawful methods they conspired together and created a purchaser. The shuttle cock *fiasco* through which they went in organizing the appellant does not change the facts, nor hide their real methods. Appellant was but the result of a previous unlawful arrangement made in the very face of our anti-trust statute. Courts can look behind corporate entities and seek the truth. No man ever bona-fide subscribed or paid a dollar of the capital stock of the Polar Wave Ice & Fuel Company. The whole performance, as revealed by this record, was a studied, premeditated "arrangement" to place the · combined strength of these several individual corporations into one hand, and with a view of lessening competition in their business, i. e., the purchase and sale of ice in the city of St. Louis. One has but to glance at the plan as shown by their contracts, and the stock-ownership both in the new and the old organization, to be convinced of what the arrangement in fact was, and its

259 Mo.—39

intended purpose. Our statute is not leveled at bona-fide sales of property by one corporation to another, when made in the ordinary and usual methods of trade, but it is leveled at just such arrangements as is disclosed by this record. This appellant was born through an idea early possessed and capitalized by Chris Muckermann, i. e., the idea of stifling competition in the sale of ice by incorporating under one head all opposition. The idea descended with increased vigor from the father to the son, I. C. Muckermann, and he and Whitelaw of the three old companies were the god-fathers of appellant, an illegitimate child, when the State laws are considered. From the very beginning the Muckermanns were possessed with the idea of dividing territory to the end that their several corporate entities should not compete one with the other. It is suggested that retailing ice must be in limited districts to be profitable, and to a certain extent that is true, but not to the extent and in the manner revealed by this record. The directing powers of the four Muckermann companies were active in confining their companies in such way as to prevent competition. That idea was one of long standing in the Muckermann companies, yet it is true that the evidence does disclose slight competition in soliciting trade at a point or two where their assigned territories joined. The evidence for appellant tended to show that, notwithstanding there were interlocking directorates in the wholesale companies, there was still competition. Grant this to be true. The organization of appellant put an end to all such competition, as well as the slight competition shown by the Muckermann companies. That the arrangement was so intended, cannot be doubted by any sane thinking man, taking the facts of the record. That the dreams of the conspiring spirits were fully realized, at the expense of the buying public, is evidenced by the material growth of appellant since its organization. In the course of a short

time it had not only charged off the "good-will" account in its assets ($400,000 or more) and substituted cash in its place, but it had made improvements valued at $800,000, or better, and all the time paid dividends upon its stocks. Such unusual prosperity is not always the result of legitimate business methods, but usually the result of doing the things specifically condemned by our statute.

As stated above, the "arrangement" by which appellant came into existence smacks much of that condemned in the Harvester Company Case, supra. Largely the same methods were followed. *Vide* opinion of VALLIANT, C. J., 237 Mo. l. c. 387-391. Further on the learned Chief Justice condemned the method in this language:

"The managers of these several corporations were men of conspicuous business intelligence, they would never have agreed to sell the property of their companies and take pay in stock of a corporation to be formed unless they knew of what that corporation was to consist. The fact that they did not all get together and agree to merge their companies in one, but on the contrary each conducted its part of the scheme in form as if it were simply making a sale of its property, showing that they were acting in fear of the anti-trust statutes. And the fact that they did not all sign one contract, but each a separate one, shows caution to avoid the appearance of combination, yet when all the several contracts were signed the effect was the same as if they had all signed one contract. And the fact that the representatives of the five companies were all in New York on that business at the same time but stopping at different hotels and holding no communication with each other again shows caution. If there had been no anti-trust laws in the land and these gentlemen had all concluded, in order to suppress what they call this unbusinesslike and ruinous competition, to unite their interests in one great

company (as in fact they did), the most natural thing for them to have done would have been to meet together and talk it over and agree on the details. In the case above cited [Standard Oil Co. v. United States, 221 U. S. 1] the Supreme Court of the United States, commenting on the comprehensive terms of the anti-trust act of Congress, which in that particular is like our statute, said: 'In view of the many new forms of contracts and combinations which were being evolved from existing economic conditions, it was deemed essential by an all-embracing enumeration to make sure that no form of contract or combination by which an undue restraint of interstate or foreign commerce was brought about could save such restraint from condemnation.' And so we say under our statute, the form of contract under which this combination was brought about cannot save it from condemnation, and respondent cannot escape the result by saying it was not designed to suppress reasonable competition, but only the ruinous and unbusinesslike methods that were then in practice, because there is no such limit in the power conferred.

"We hold that the International Harvester Company, the New Jersey corporation, is an unlawful combination to suppress competition and regulate prices within the meaning of our statute, and therefore it has no right to do business in this State."

To what the learned Chief Justice there said, the writer hereof added the following:

"The stock held by these trustees was held in proportion to the amount put in by these several component corporations, save and except certain amounts fully discussed in the principal opinion. Was this an arrangement or combination with the view of lessening competition? It was not a bona-fide sale, because the sellers had to create their own buyer. It was a device to combine all their property into one huge

concern and for what purpose? In view of the facts and upon conscience can we say it was not done with the view to lessen free and full competition? We think not." . . . [l. c. 411.] "Aggregations of large properties by bona-fide purchasers in the usual business way do not fall under the ban of the statute, but when the would-be sellers have to erect a straw man for the purchaser, the credulity of the court is strained, when we are asked to brand it as a bona-fide transaction. [l. c. 416.]

"Viewing this case from any standpoint, it is clear that the merger of all these interests in one giant concern, was made for the purpose, to use the language of the law, 'with the view to lessen . . . full and free competition,' all in violation of our statutes as they exist now and as they have existed since 1897." [l. c. 415.]

I have not departed from those views, and the facts of this case bring it squarely within the facts of that case. In this case the appellant was as fully a party to the elimination of competition as was the International Harvester Company of New Jersey. In Harding v. American Glucose Co., 182 Ill. 551, the Illinois Court said:

"There is no reason why the American Glucose Company should not have continued to prosecute its own business, instead of turning it over to be prosecuted by a new corporation, unless the officers, directors and stockholders, making the transfer to the new corporation, expected, by suppressing competition, to fix and control prices, and thereby increase their own profits to the injury of the consumers of the manufactured product and of the public generally. It must be remembered, that these transfers of property were not made by the six corporations to a corporation already existing and doing business, but a new corporation was to be created and was created, for the express purpose of taking and using the properties to be con-

veyed to it. All the arrangements for the several trans-
fers were made before the new corporation was allowed
to come into existence. The only purpose of its exist-
ence was to take and use, in a consolidated form, all
the plants of the six old corporations. The illegal trust
or combination was formed, not after the making of
the sales, but by the sales themselves.

"The contention of counsel for the Glucose Sugar
Refining Company that the American Glucose Com-
pany had a right to make a sale of its plant to the new
corporation, and that this transaction must be regarded
by the court merely as a valid sale, is not supported
by the allegations of the pleadings, or by the proofs
herein. The transfer of its property, made by the
American Glucose Company, was a transfer to a cor-
poration, created for the express purpose of taking its
property and the property of other corporations, so
as to use them in the suppression of competition, and
in the creation of a monoply in the manufacture of
glucose, and grape sugar, and their products and by-
products. The whole scheme, as devised and consum-
mated, was a fraud not only on the public, but upon
the dissenting stockholder filing this bill."

Other cases might be cited and quoted from, but
such would be to add to the volume of this opinion.
The facts of this case bring it squarely within the an-
nouncements in the Harvester and Standard Oil cases
in this court. Judge SHIELDS, the trial judge in this
case, prepared an elaborate opinion, and we are im-
pressed with the following remarks contained therein:

"A few facts alone contain the gist of this case.
There were seven Missouri corporations dealing in
ice in the city of St. Louis prior to February 13, 1903.
It is claimed that they were free and independent of
each other and managed separately without regard
to the interests of the others. The preponderance of
the evidence negatives this claim. There was a con-
ceded community of interests, as has been already

shown herein, and a practical management by the incorporators of the new company, as herein shown. They controlled some twenty per cent of the wholesale trade and forty or fifty per cent of the retail trade in the city of St. Louis. By a series of contracts and paper payments, without the actual payment of a dollar to anyone, the assets of the seven companies became the property of the respondent company, which transacts all of the business of the old companies, both in the wholesale and retail trade, and controls from fifty to sixty per cent of that entire trade, both retail and wholesale, in the city of St. Louis, yet the statutes of the State which forbid combinations which tend to lessen or diminish competition, are not violated, and the amalgamation is justified on the ground that the new company does not control the market.

"If the anti-trust statutes permit this what is to prevent all of the leading millers in the city from organizing a monster corporation by a series of contracts and fictional payment of capital stock, and exchanges of old stock for the stock in the new company, and thus put the manufacture of flour in the city in the same hands? What is to prevent all of the leading bakers from doing likewise and controlling the greater part of the bread manufactured in the city by a giant corporation? What is to prevent the principal dairies and milk dealers from 'amalgamating' by a similar process, or the druggists or the coal dealers, or any other dealers in the necessaries of life from 'amalgamating' under a similar process? It would not be expensive, for no payment need be made except lawyers' fees, and incorporation fees, but what would be the condition of the city? In other words, the anti-trust statutes are meaningless. This court cannot consent to eviscerate the anti-trust statutes by construction. They are beneficial laws and ought to be enforced and not destroyed by circumambulation.''

Upon the record then the appellant was rightfully found guilty under the information. There is some question in my mind as to the punishment fixed, and this I take next.

III. In view of the situation presented by this record I am impressed with the idea that the judgment *nisi* is too drastic. That the very act of incorporating this appellant was an arrangement or combination in violation of our anti-trust laws, stands out in bold relief upon the record before us. That this appellant was a party to such arrangement is verified by the fact that after it became a corporate entity, it took over and received all the holdings of the seven original and constituent companies. Both in spirit and in flesh appellant was a part and parcel of a gigantic arrangement to thwart and stifle competition in the sale of ice, both at retail and wholesale. Its power to regulate production and price is apparent. There is a bit of evidence by one party that it threatened with its power to drive out competition by cutting prices below cost of production. It is also shown that it does from forty to fifty per cent of the St. Louis ice business. But whilst these things are true, and we have not minimized them in the least, it is also true that the record shows the appellant to be in open competition with other ice concerns for the business of the city, and some of them of considerable proportions. It has its supply stations all over the city for rapid and efficient public service. Being under one head, and being one body and one soul (if we may be pardoned the latter term) of course its different sub-stations do not compete with each other, but there is actual competition from other ice dealers in practically all sections of the city. This refers more particularly to the retail trade. In the wholesale ice business it has active and strong competition and from parties rather financially strong, as we glean the facts from the record. It also appears

from the record that after the seven original corporations had been able to perfect the title to their different properties, they surrendered their charters, and have no further corporate existence. It required a year or better to get all titles perfected in appellant, close up business, and surrender the charters. However it has been done, all the property is now held by appellant, and being operated by appellant as one concern. It is not a case where the court can dissolve the appellant, and let the property go back to the original corporations, as in the Federal International Harvester case. We have a case where ouster means the taking out of the ice business in St. Louis a large portion of the capital invested in such business. It means the withdrawing of a very substantial competition from the trade, as we had in the Harvester case in this court, 237 Mo. 369, supra. If by the dissolution of appellant, we could separate its holdings and force them back to their original sources, such course might be well, but we have no such situation. We have a case here where there was a wrongful arrangement tending to stifle competition, but no evidence to speak of that warrants us to say that the new enlarged corporation has not been competing.

Under our statute, section 10304, Revised Statutes 1909 (which in present form was first enacted in 1907— Laws 1907, p. 377), the trial court was authorized to enter a judgment forfeiting its corporate rights, and in addition could forfeit a part or all of its property to the State "or in lieu of the forfeiture of its corporate rights and franchises, or in lieu of the forfeiture of all or any part of the property of such corporation, assess against it a fine." This judgment was not rendered until 1910, and the Act of 1907 was therefore applicable. The statute, supra, is broad enough to cover four kinds of judgments, thus: (1) ouster of corporate rights and powers, but leaving the property

to follow the course of all dissolved corporations; (2) ouster of corporate rights and powers, and in addition thereto a forfeiture to the State of a part or all of the corporate property; (3) a judgment ousting it of its corporate rights and franchises and a fine in lieu of a forfeiture of property, and (4) a fine in lieu of both the ouster of the corporate rights and franchises and the forfeiture of property. The court *nisi* chose the first form of judgment.

But this court has not always confined itself to the statutory judgments. We have held to our common-law powers in trust cases. [Vide Standard Oil Co. and International Harvester Co. cases, supra.] We have the same power in a case coming from the circuit court as we have in one originally brought here, and this, not only because of the common-law powers possessed by this court, but because the circuit court was possessed of like powers, and could enter just such judgments as we enter in like cases. We have deemed it prudent to hold a whip hand upon corporations disposed to violate our anti-trust laws, as indicated by the cases cited supra. In the Standard Oil case, as to the Waters-Pierce Oil Co. we entered a judgment of conditional ouster, and a fine. So too in the Harvester case. In the case at bar the trial court could not have done otherwise than to have found this respondent guilty, but under the facts of this case, as we have undertaken to fully set them out, we believe that it will be to the best interest of both the State and the appellant to modify and change the judgment *nisi* and enter a new judgment here. In lieu of a judgment of absolute ouster we think that there should be a judgment of conditional ouster, as we entered against the Waters-Pierce Oil Company in the Standard Oil Company case, supra, and in the Harvester case, supra, and in addition a fine of fifty thousand dollars. We should retain jurisdiction of the case, just as we did in the two cases mentioned, so that if proof is afterward

made to this court that appellant is in any way violating our anti-trust laws, we can withdraw our suspension of the ouster, and make such ouster absolute. To end the case the judgment *nisi* will be set aside, and a new judgment entered here, as above indicated. It is so ordered. All concur.