STATE of Missouri, on Information of Thomas F. EAGLETON, Attorney General, Relator,

v.

STUPP BROS. BRIDGE & IRON COMPANY, Kansas City Structural Steel Company, St. Joseph Structural Steel Company, Missouri Valley Steel, Inc., A. J. Industries, Inc., and Havens Structural Steel Company, Respondents.

No. 49659.

Supreme Court of Missouri,

En Banc.

July 13, 1964.

Thomas F. Eagleton, Atty. Gen., J. Gordon Siddens, Albert J. Stephan, Asst. Attys. Gen., Wm. Coleman Branton, James C. Wilson, Sp. Assts. to the Atty. Gen., for relator.

R. H. McRoberts, E. C. Hartman, Stuart Symington, Jr., St. Louis, Bryan, Cave, McPheeters & McRoberts, Joseph J. Kelly, Jr., Howard F. Sachs, Spencer, Fane, Britt & Browne, Kansas City, Robert A. Brown, Brown, Douglas & Brown, St. Joseph, Richmond C. Coburn, Coburn, Croft & Cook, St. Louis, Colvin A. Peterson, Jr., Landon H. Rowland, Kansas City, Watson, Ess, Marshall & Enggas, Kansas City, for respondents other than A. J. Industries, Inc.

Coburn, Croft & Kohn, Richmond C. Coburn, Alan C. Kohn, St. Louis, for respondent Missouri Valley Steel, Inc.

Edward C. Freutel, Jr., Los Angeles, Cal., John E. Park, John H. Kreamer, Kansas City, for respondent, A. J. Industries, Inc., O'Melveny & Myers, Los Angeles, Cal., Gage, Hodges, Park & Kreamer, Kansas City, of counsel.

Robert L. Hyder, Jefferson City, Chief Counsel, amicus curiae, State Highway Commission.

HOLMAN, Judge.

This original proceeding in quo warranto was instituted on July 18, 1962, by the filing of an information charging respondent corporations with violation of the Missouri anti-trust statutes. See §§ 416.010 to 416.040 [1] inclusive. Respondents are Stupp Brothers Bridge & Iron Company, Kansas City Structural Steel Company, St. Joseph Structural Steel Company, Missouri Valley Steel, Inc., A. J. Industries, Inc. (hereinafter referred to as "Reynolds," the name of the division of A. J. here involved and of its predecessor, Reynolds Manufacturing Company), and Havens Structural Steel Company.

The information charged that the respondents, all engaged in the business of fabricating structural steel for use, among other things, in the construction of bridges, "during a long period of time immediately prior to the filing of this information," were members of a conspiracy (1) to control, fix and maintain the price at which fabricated steel would be sold "for use in constructing bridges for the State of Missouri," (2) to control and limit the trade in fabricated steel for bridges for the State of Missouri by refusing to sell or make a bona fide offer to sell fabricated steel to any contractor for use in constructing a bridge for the State of Missouri in certain areas of the State, (3) to lessen full and free competition in the sale of fabricated steel "for use in the construction of bridges for the State of Missouri," and thus to increase the market price of such fabricated steel, and (4) to act generally in restraint of trade and competition in the sale of fabricated steel for bridges in Missouri.

The information further alleged that said conspiracy and the acts pursuant thereto caused contractors engaged in constructing bridges for the State of Missouri "to pay unreasonably high, arbitrary and fixed prices for fabricated steel used in the construction of said bridges" with the result that the cost to the State of Missouri for said bridges has thereby "been unreasonably and unlawfully increased." The prayer of the information was for ouster or penalty.

The answers filed by the various respondents denied the essential allegations of the information and also pleaded that any cause of action which may have been alleged in the information accrued more than three years before the filing thereof and is therefore barred by the provisions of §§ 516.130 and 516.360. (There is no controversy about the fact that the foregoing statutes are applicable herein and that the three-year limitation period began on July 18, 1959.)

On November 14, 1962, this court appointed Hon. Robert L. Hawkins, Jr. as special commissioner to take testimony and report findings of fact and conclusions of law herein. After extended hearings (as

[1]. All statutory references are to RSMo 1959, V.A.M.S.

indicated by the transcript of 1,700 pages, together with 119 exhibits) the special commissioner filed his 88-page report on February 25, 1964. Therein, after discussing the evidence in detail and considering the law applicable thereto, he concluded as follows: "The issue here is the existence and operation of a conspiracy alleged to be in violation of the state anti-trust laws *within the statutory three-year period*. The conclusion is that there was no such conspiracy as that charged in existence or in operation during that period. It is not necessary to find whether there was an antecedent functioning conspiracy and no such finding is made or intended. It is, therefore, the recommendation of your Special Commissioner that the charges set forth in the information be dismissed and the respondents discharged."

The first witness called by relator was F. Joe DeLong, the president of DeLong's, Inc. of Jefferson City, Missouri, a family corporation with 160 employees. In relating Mr. DeLong's testimony we will refer to him and to DeLong's, Inc. as one entity. DeLong testified that he first entered the business of fabricating steel bridges in 1952 when he was awarded a contract for two bridges by Ed Kieselbach, a contractor. Shortly thereafter Paul Marti, representing Wilmar Steel Products, contacted DeLong and demanded that he "give up" the bridges. According to DeLong, Marti stated that the bridge business in Missouri was allocated between the respondents and threatened that unless DeLong gave up these bridges they could cause considerable price difficulty for him in and around Jefferson City. A few days later, DeLong called Marti and told him that he would deliver the two bridges in question but would thereafter stay out of the bridge business. After completing the bridges for Kieselbach DeLong withdrew from the bridge business until early 1954 when he again began bidding for bridges included in contracts let by the State Highway Commission.

At this point we will digress from the testimony of Mr. DeLong and explain briefly what is shown by other evidence to be the procedure for bidding as it relates to bridges on state highway projects. Notices are furnished by the highway department as to projects on which bids are invited at lettings held at various times through the year. Interested contractors and suppliers select the projects in which they are interested and request plans. Only the largest bridges, such as those spanning the Missouri River, are let as separate contracts directly with the bridge steel fabricator. The bulk of the bridges are parts of larger projects which the prime contractor bids on. Suppliers of bridge steel estimate the cost of the steel for a certain bridge and then quote their price to various prime contractors. Prime contractors ordinarily utilize the lowest quoted price in making their bid for the project. These negotiations ordinarily occur in Jefferson City the day before the bids are read. After the general contract is awarded the prime contractor may continue to negotiate with the steel fabricators and often will obtain a final price lower than the best one quoted prior to the awarding of the contract. The prime contractor will then enter into a contract with the steel fabricator for the steel needed in erecting the bridge involved.

DeLong quoted a price on a bridge in March 1954 and received the contract. Shortly thereafter he was contacted by Marti, and by Charles Soper of St. Joseph Steel, both of whom demanded that he get out of the bridge business. When DeLong refused they stated that by his bidding he was upsetting the price structure and invited him to join "the group," explaining that by having bridges allocated to him in that manner he could make a profit. DeLong was told to call John Thomsen of Stupp Brothers and advise him of a bridge he was interested in getting, and the price he would bid for it, and that Thomsen would see that other fabricators bid higher so that he, DeLong, could get the bridge at a profit. In accordance with that suggestion DeLong

selected a bridge in Texas County which was to be let on January 28, 1955. He called Thomsen, identified the bridge, and gave him the price he planned to quote to the contractors. DeLong secured the bridge, although he was forced to cut his original price in order to meet the price quoted by a competitor from Tulsa, Oklahoma.

DeLong was invited to attend a meeting in the offices of Stupp Brothers in St. Louis on February 21, 1955. He testified that those present were Marti of Wilmar, and Erwin Stupp, John Thomsen, and Rex Fossnight of Stupp Brothers. Although DeLong testified positively that Thomsen was present at this meeting, it was later stipulated between the parties that Thomsen was in fact in Hawaii on that date. At that meeting those present explained to DeLong that the state was divided into two areas with some companies doing the bridge work in the area consisting of the approximate eastern two thirds of the state, and that other companies did the work in the area consisting of the approximate western one third of the state. DeLong produced a state highway map with a line drawn from north to south which showed the two areas. He stated that this line was drawn at that meeting by those present other than himself. DeLong was told that Stupp Brothers and Wilmar obtained the bridge work in the eastern part and that the other respondents obtained the work in the western area, although Reynolds was permitted to bid in both areas around Springfield. DeLong was told that he would not be limited to either area but if he desired a particular bridge he was to call John Thomsen.

Following that meeting DeLong returned to Jefferson City, consulted with his attorney, and did not join the group. Shortly thereafter he bid on and secured two bridges. Marti contacted DeLong and was told by him that the methods followed by the group were illegal and that he (DeLong) would have no part in it. Marti then arranged another meeting at the Stupp Brothers office for April 6, 1955. At this meeting Thomsen and Erwin Stupp both tried to persuade DeLong to become a part of the group. They told him that if he wanted to stay in the bridge business he would have to belong to the group and take the bridges allocated to him, explaining that that was the only way a profitable business could be conducted. It was stated at that meeting that because of DeLong's freight disadvantage they could run him out of the steel fabricating business. Immediately after that meeting DeLong went to his hotel room and made notes concerning the occurrences herein related and these notes were produced at the hearings in this case. After again conferring with his attorneys DeLong called Thomsen and stated that he could not join the group but that in the future he would call him, Thomsen, and identify the bridges he intended to bid on.

DeLong testified that shortly after these events the price of steel I-beams and I-beam spans became "extremely low." Those beams were the type used by DeLong on the jobs he was seeking to obtain. He stated that when he bid on a job other suppliers would cut the price after the letting in an effort to prevent him from receiving the work.

In September 1957 DeLong was invited to meet with Marti and Soper in Kansas City. They again tried to persuade him to join the group but he refused, although he did say that he would not hurt them "price-wise." At a letting on November 1, 1957, Marti became quite agitated when he found that DeLong was the low bidder on a job he had expected to obtain, and Marti, in the presence of the contractor and DeLong, offered to meet or cut DeLong's price. The contractor refused to accept the offer and, at that time and in Marti's presence, signed an agreement with DeLong.

In the spring of 1958 DeLong met Tom Soddy of Stupp Brothers in Washington, Missouri, at which time Soddy again tried to get DeLong to join the group and "quit

this fighting," but DeLong again declined to join. In August of 1958, Soper of St. Joseph Steel, told DeLong that a large bridge job was coming up in Buchanan County; that it had been allocated to St. Joseph Steel by the other western fabricators, and that if he, DeLong, did not bid he would see that a part of the job was subcontracted to him. DeLong did not bid and the job was obtained by St. Joseph Steel who gave a substantial portion of it to DeLong. In January 1959, Soper called DeLong and asked him to attend a meeting of fabricators in Kansas City but DeLong declined to attend that meeting.

DeLong further testified that at practically every highway letting during 1959, 1960, and 1961 he was contacted by Charles Soper and Paul Marti and urged to "quit this fighting and work out something on this situation." DeLong also stated that during the "past three years" the eastern fabricators had continued to do the work in the eastern part of the state and the western fabricators had continued to do the work in the western area.

It was developed on cross-examination that during the latter part of 1958 DeLong talked with Rex Whitton, the chief engineer of the highway department, concerning the procedure followed by bridge fabricators. Shortly thereafter, on November 13, 1958, he talked with Robert L. Hyder, chief counsel for the highway commission. As a result of that conversation Hyder prepared a memorandum in which he recited much of the information heretofore related. That memorandum was forwarded, in a letter dated December 11, 1958, to an agent of the Federal Bureau of Investigation with the request that he forward the information to the anti-trust division of the Department of Justice. Thereafter, on March 6, 1959, DeLong and his attorney conferred with Robert R. Welborn, an assistant attorney general. Also, on April 7, 1959, DeLong had a conference with Mr. McCarein, an attorney for the United States Department of Justice. It was also developed that De-Long's, Inc. had sued the respondents in the federal court seeking damages in the sum of $4,725,000. It was alleged in the petition in that action that respondents made exorbitant profits on large bridges concerning which DeLong could not bid and submitted very low bids on bridges in competition with him. DeLong stated that in 1957 he could not bid on a job where the bridge sections weighed more than 10 or 12 tons or where the cost was more than $200,000, but that he has since increased that capacity somewhat. He conceded that he joined the conspiracy in 1955 for one letting only. He also conceded that in some instances companies other than respondents bid and obtained bridge jobs in Missouri.

In connection with the testimony of De-Long it should perhaps be stated that it appears in certain exhibits that during the three-year period immediately preceding the filing of the information in this case De-Long sold more highway bridges in Missouri than any other fabricator.

Relator vigorously complains of the failure of the commissioner to make a finding as to the existence of a functioning conspiracy between respondents prior to July 18, 1959. We recognize that the view taken by the commissioner made such a finding unnecessary. We understand, however, the reason why relator desires such a finding, as such (if found to exist) would coordinate with his contention that, in said event, he need only to prove an overt act in furtherance of that conspiracy within the statutory period. We have concluded that we will dispose of that contention at this time by assuming, for the purposes of this opinion, that the conspiracy did exist for a period of time prior to the date De-Long complained to the officials of the highway department, and that said conspiracy functioned substantially in the manner as described in DeLong's testimony. In view of that assumption we will not extend this opinion by stating the testimony of the other witnesses (with certain exceptions) which relates to the issue of said prior conspiracy.

Paul Marti was called by relator and testified that from 1945 until 1960 he was employed by Wilmar Steel Products Company selling fabricated steel and other items. Wilmar was the exclusive sales agent in Missouri for Illinois Steel Bridge Company of Jacksonville, Illinois. Wilmar went out of business at the end of 1959 but Marti personally continued as agent for Illinois Steel until December 31, 1961. The testimony of Marti tends to indicate that a sales conspiracy existed for a number of years in Missouri between the respondents.

This witness testified that in 1957 he informed Stupp Brothers that thereafter he would bid on bridges as he saw fit, and that he followed that practice for about six months. However, in the spring of 1958 Mr. Keadey, President of Illinois Steel, conferred with Mr. Thomsen of Stupp Brothers and thereafter advised him (Marti) that they would continue to cooperate with Stupp Brothers; that he then went back to the old policy which continued for six or eight months, probably until late 1959 (1958?); that at that time he met with Thomsen and Soddy at the parking lot of Schneithorst's West Restaurant in St. Louis; that they met about dark after having agreed upon the meeting in a telephone conversation; that at that meeting Thomsen and Soddy informed him that an investigation was going on concerning structural steel bridges in Missouri, and suggested that Illinois Steel bid in northeast Missouri and Stupp Brothers would bid more to the south; that they would not make "tight bids against each other in those territories"; that said arrangement continued for four or five months until Stupp Brothers took a job in northeast Missouri and then we started bidding "wherever we pleased"; that he saw Joe DeLong from time to time from 1954 to 1958 or 1959 and told him on many occasions that "I thought perhaps it would be to his interest to cooperate with the group." When Mr. Marti was asked whether the "line" was observed until the end of 1959, he answered, "to my knowledge, the practice was generally observed most of

the time." He also testified that it was observed until he quit selling bridges on December 31, 1961. On cross-examination Marti stated that at the restaurant meeting he had been told that "there would be no more discussion of jobs."

Relator also called as a witness Ernest W. Kraner who formerly was employed by Havens. Kraner testified that he sold structural bridges to general contractors for Havens from July 1957 until September 1959. He testified to facts tending to support a finding that respondents were members of a conspiracy as heretofore described. He then testified as follows: "Q Now did this situation exist in September of 1959 when you left Havens Steel Company? A They were still bidding bridges when I left the company, yes. * * * Q (by Mr. Branton) Were you still bidding them in the same way when you left there? A Yes, sir. Q In September of 1959? A Yes, sir." It developed on cross-examination of this witness that he did not attend a bridge letting after May 22, 1959, and made no trips to Jefferson City between that time and September 11, 1959, the date his employment ended. Also, it appeared that the last bridge job Havens obtained before that date was in January 1958.

Another witness called by relator was Walter Kirst who was employed for many years by Reynolds of Springfield, Missouri. He testified that in November 1956 Mr. Reynolds sold all his stock in the Reynolds Company to A. J. Industries. Mr. Kirst stated that he started bidding for bridges with contractors on jobs around Springfield in 1937 and later began trying to sell bridges to be erected farther away from their plant; that he continued as head of the structural steel department until April 1960 when he was transferred to the executive department. Kirst testified that he began cooperating with respondents in the manner of bidding in 1945 and continued that practice until served with a grand jury subpoena May 18, 1960. He stated that he was to contact Mr. Thomsen on jobs in the eastern part of the state and Mr. Boyd of

Kansas City Structural Steel on jobs west of the line. He stated that he took one job in the northern part of the state which was not allocated to him but that was the only job he could recall, between 1954 and 1960, in the western area that he had bid on without first getting the approval of Boyd; that occasionally Mr. Boyd would say, "we will all bid on this job and let the best man win"; that on one occasion Paul Marti, representing Illinois Steel, "underbid a bridge on us in Taney County after the job had been allocated to us"; that in January 1960 a contractor had a bid lower than we were willing to take the job for on three Greene County bridges, and Fossnight of Stupp Brothers "contacted me and I relinquished the job and he went ahead and got the order." On cross-examination it developed that, except for a job in 1954 in Montgomery County, Reynolds had no jobs in the eastern part of the state except around Springfield. It was also shown on cross-examination that in 1959, 1960, and 1961 Reynolds lost money on almost every job it sold and had competition on every job it attempted to obtain.

Loren G. Hoffman testified that he was a CPA with the firm of Ross, Bailey and Smart, and that at the request of relator he had examined the books of various respondents and had prepared certain exhibits from the information he had thus obtained. Exhibits 28 to 33, inclusive, related to five projects upon which Stupp Brothers were the prime contractors, which included the Mark Twain Expressway (overpass bridge structures), St. Charles bridge over the Missouri River, and the Boone-Cooper bridge also over the Missouri. Exhibit 43 related to five projects sold by Kansas City Structural Steel. Exhibit 44 is a schedule of profits on certain bridge contracts of Missouri Valley, and Exhibit 45 is a similar schedule relating to St. Joseph Structural. The foregoing exhibits are of doubtful value since it was developed on cross-examination that the witness, in making the computations, used the five most profitable jobs of each of the respondents over a

certain period of time. Exhibit 47 is a schedule showing the assets and net worth of respondents prepared from various balance sheets obtained from their records.

William J. Kleene testified that he is employed by the Missouri Highway Department as a bridge designer; that he prepared Exhibit 21 from the records of the department, which exhibit lists every new fabricated structural steel bridge let by the department from January 1, 1954, until July 1, 1962. He also prepared Exhibit 40 which is a list of all other bridges, such as revised steel bridges (old bridges that are widened, strengthened, etc.), and concrete bridges using fabricated structural steel.

Robert Barren, drafting supervisor for the Missouri Highway Department, testified that he prepared Exhibits 24–A to 24–K which are county outline maps with colored symbols thereon indicating by counties the highway bridge jobs sold by respondents and Illinois Steel. These maps show the jobs for each year from 1954 to July 1, 1962, and Exhibit 25 is a composite map showing the location of all jobs sold by said companies during the period heretofore mentioned. Exhibit 39 is a similar map showing the jobs sold by DeLong during that period. This witness testified that during the period mentioned Stupp Brothers had three jobs west of the line and that Havens had three jobs east of the line (although it had only four jobs west of the line); that Missouri Valley had one job east of the line, St. Joseph Structural had none east of the line, and Illinois Steel had none west of the line; that Reynolds of Springfield had a scattering of jobs both to the east and west of the line; that none of the aforementioned maps showed the jobs that had been sold by fabricators other than DeLong, Illinois Steel, and respondents.

In detailing the evidence of a number of the witnesses we have mentioned (and will hereinafter mention) various exhibits that were identified. These exhibits were admitted in evidence and, in so far as they materially affect the issues, the information

contained therein will be stated later in the opinion.

Stupp Brothers called as a witness Virgil S. Chandler, a CPA, who testified that he had examined certain records of DeLong's, Inc. relating to price, costs and profits on Missouri bridge jobs. He prepared Exhibit 104 which was admitted in evidence and which showed that during the six years— 1957 to 1962, inclusive—the aggregate profit of DeLong on those bridge jobs totaled $232,915.

The next witness called by Stupp Brothers was John P. Stupp, vice-president, secretary and treasurer of said corporation. He testified that his father, Erwin P. Stupp, was president of the corporation and that his two brothers, Robert and Erwin P. Jr., were also in the business. He stated that in 1952 his company made capital expenditures of approximately $1,500,000, and that at least one half of that amount was expended in order to enlarge their bridge yard and crane capacity so that they could fabricate bridges the size of those which cross the Missouri River. This witness further testified that during the period of July 1, 1959, to June 30, 1962 (substantially the limitation period here involved), Stupp Brothers lost $133,107 on bridge sales for Missouri highways, and that during the same period Stupp Brothers made a net profit of $2,765,077 on other commercial steel sales. Mr. Stupp then testified that all of the allegations in the information in this case, as relates to his company, were false; that the first he knew of the DeLong complaint was when he attended a meeting at his father's home on Sunday, January 18, 1959, at which were present, in addition to his father, Thomsen, Soddy, Robert P. and Erwin P. Stupp, Jr. and the witness; that at said meeting his father advised those present that he had received information from Leo Fisher, then Chairman of the State Highway Commission, that an investigation was probable concerning the structural steel fabricating industry in Missouri in connection with anti-trust matters; that

his father then asked all present if there was any reason for their company to be involved in such an investigation and he was told that there was not. He then instructed all of those present that there should be no future fraternizing with competitors and there should be nothing which would lend any appearance of support to the charges mentioned. The witness stated that he testified before the federal grand jury early in January 1961 and the federal indictment was returned January 5, 1961; that his company has continued to this date in furnishing fabricated steel for bridges in Missouri without any question having been raised by the Missouri State Highway Commission.

On cross-examination this witness stated that the profit of Stupp Brothers on the Jefferson City Bridge, before taxes, totaled $195,914 (the Hyder memorandum had indicated that DeLong had estimated that profit at $1,000,000). Mr. Stupp further testified that the Schneithorst's meeting heretofore mentioned occurred very shortly after the meeting in his father's home in January 1959; that John Thomsen was in charge of sales for Stupp Brothers until the end of 1960; that his father, at the time of the hearings, was not in good health; that Fossnight was still employed by the company. This witness also conceded that his company had sold some bridges in Clay and Jackson Counties for other than state highway purposes but had not sold any bridges west of the alleged line for contractors with the state highway department except three bridges in Greene County.

Thomas B. Soddy also testified as a witness for Stupp Brothers. He related that he had been in the sales department for nine years and that he and Fossnight usually attended every letting in Jefferson City in an effort to sell bridges to the prime contractors; that on February 21, 1955, Paul Marti brought Joe DeLong to their plant for a visit; that there was a discussion in the conference room between them, Fossnight, and the witness; that halfway

through the visit Marti suggested that "we lay off of a couple of jobs for Marti and DeLong," and that he told them he would have no part in any such agreement; that Erwin Stupp was not present at the time of that conversation, and that no map was exhibited by anyone at that meeting.

Soddy described the meeting at the Stupp home on January 18, 1959, in about the same manner as has been heretofore related. He stated that between January 18 and January 30 he called Marti and arranged for him to meet Thomsen and the witness at Schneithorst's at about 5 o'clock one afternoon; that he had planned that they would go in and have a drink but Marti didn't have much time so they talked in his car; that he told Marti of the possible investigation and that they were not to be seen talking at any time because it might create suspicion; that from that day on he never had any conversation with Marti in regard to bids, etc. on Missouri bridges. Soddy unequivocally denied having any conversation with Marti to the effect that Illinois Steel would bid on bridges in northeast Missouri and Stupp would confine its bids to other parts of the state. He related that they continued to bid against Illinois Steel in northeast Missouri and obtained two jobs in north Missouri in competition with Illinois Steel at the letting on January 30, 1959; that during the three-year period prior to July 18, 1962, Stupp Brothers sold 34 jobs north of the river and Illinois Steel six, and that he had made serious bids against Illinois Steel on the six jobs that it sold; that on a bridge in Webster County which was let August 25, 1960, Stupp's final bid was .1124¢ per pound and the job was sold by Reynolds for .12¢ per pound; that he didn't know why it was sold for a price higher than they had bid except that perhaps Reynolds had a prior commitment from the contractor. Mr. Soddy testified that during the three-year period prior to July 18, 1962, there never was any allocation of jobs or bidding between Stupp Brothers and Wilmar and that no bids were made on any jobs that were other than true competitive bids; that there was also no allocation on jobs as between Stupp Brothers and Reynolds or any of the other respondents. The information in this case was read to the witness, paragraph by paragraph, and he stated that the charges in each paragraph were false.

Kansas City Structural Steel called one witness, John S. Harrow, its president, general manager, and treasurer. Mr. Harrow testified that John Boyd was in charge of the sale of bridges and that he had recently been assisted by Thomas Fitch, assistant general manager; that during the limitation period his company had sustained a loss of $48,845, in the aggregate, on all bridge jobs for the Missouri Highway Department; that Kansas City Structural had bid on the three Greene County projects which were sold by Stupp Brothers in January 1960; that on a bridge in Barry County (west of the line) in January 1958 his company had been unable to sell the prime contractor, C. Rollo Construction Company of St. Louis; that they employed Mr. Marti, who was friendly with Rollo, and Marti succeeded in selling the bridge for them and they paid him a commission of $1,500 for his services; that Stupp Brothers were definitely competing for that bridge; that Kansas City Structural bid on 68 Missouri highway bridge jobs during the limitation period which it was unable to sell. Mr. Harrow further testified that in January or February of 1959 Mr. Boyd reported to him that there was a rumor in Jefferson City to the effect that DeLong had complained to the federal government and that an investigation was under way by the government concerning the sale of fabricated steel bridges for Missouri highways. Mr. Harrow further testified that all of the allegations in the information in this case are false.

St. Joseph Structural called as a witness its president and general manager, Robert C. Chesney. Mr. Chesney explained that his company never bid as a prime contractor for large river bridges as it did not have equipment for that type of work; that it had always been the policy of the company

to confine its major sales efforts to northwest Missouri, the area in which it was most competitive. This witness further testified that before the end of 1958 they had learned, through John Williams, a bridge engineer for the highway department, of the DeLong complaint and the Hyder letter; that he immediately made an investigation and talked with Mr. Soper and could find no grounds for any complaint as far as his company was concerned. He stated that Mr. Soper had been an employee of the company since 1922 and was still employed by it. Mr. Chesney also testified as follows: "Q To your knowledge, did St. Joseph Structural Steel ever refrain from making a bid because somebody else asked it to? A No, sir. Q Did you ever make a bid which in your judgment was not an honest, competitive bid? A No, sir. Q When you bid on a job, did you bid it earnestly and competitively? A Yes. Q Mr. Chesney, are you familiar with the charges that were filed by the state in this suit against your company? A Yes, sir. Q Without taking the time to read them, you heard Mr. McRoberts read them yesterday or the day before? A Yes, sir. Q To the best of your knowledge, information and belief, and pertaining to St. Joseph Structural Steel, are those charges true or false? A They are completely false."

Jack D. Knight, vice-president and comptroller of St. Joseph Structural, also was called as a witness. He stated that he and Mr. Chesney learned of the Hyder letter toward the end of 1958 and, although they could find no basis for any complaint against their company, they instructed Mr. Soper that he was "in no way to conduct himself in any manner that would lend any credence at all to this rumor that we had heard about an investigation; to conduct himself properly at all times; to be very cautious in his relationship with any of the competitors' salesmen, even to the extent of not having a drink, a friendly drink, with them."

Mr. Knight also testified that it cost money to make quotations on bridges and that his company had never submitted any quotations except where they intended to get the job; that all of their bids were in good faith and competitive; that during the limitation period his company had lost an aggregate of $61,098 on bridges sold to contractors for Missouri highways. He also testified that the charges in the information in this case were "absolutely false."

James V. Oliver, President of Missouri Valley Steel of Leavenworth, Kansas, testified as a witness for that company. He stated that Russell Keeler estimated and sold bridges and was the only person with the company who knew anything about estimating and selling fabricated steel; that Mr. Keeler died very suddenly October 8, 1958; that at no time had Mr. Keeler ever told him of any division of the state between fabricators so that certain fabricators could sell certain jobs. Mr. Oliver explained that steel was in short supply until 1957 or 1958 and was allocated; that during that time competition was not so strong and fabricators were able to sell their products at a profit; that after steel became plentiful prices became very competitive and fabricators would often have to sell below cost. In explaining why a fabricator would sell at a loss, he stated that in order to cover the overhead of the entire plant, and not lose their skilled labor, it was often better to take a job at a loss rather than not sell the steel at all. He stated that their jobs were concentrated in Platte and Clay Counties and in the tier of counties on the western edge of Missouri because their delivery costs were much less in those areas; that from January 1, 1954 to July 1962, Missouri Valley made a profit of 12.06% on bridge jobs in Platte and Clay Counties, whereas their profit on bridge jobs in all other counties averaged 1.54%; that during the limitation period involved in this case his company lost $19,283 on jobs sold to contractors erecting bridges for the Missouri State Highway Department.

Missouri Valley also called as a witness George Huvendick. Mr. Huvendick testi-

fied that he became sales manager for the company upon the death of Mr. Keeler; that he had handled the sale of fabricated steel for bridges in Missouri since November 1958, and in that way has become acquainted with salesmen for other fabricators. He stated that no one had ever told him anything to indicate that there was a conspiracy among the fabricators in regard to the manner of bidding on bridges for Missouri highways; that every bid he had made was in good faith and with the intent of getting the job.

A. J. Industries offered the testimony of George T. Fox. Mr. Fox testified that he had been employed by Reynolds since 1932 in charge of the brake drum division; that when A. J. acquired all of the stock of Reynolds in 1956 he was made a vice-president of A. J. and was placed in charge of the Reynolds Manufacturing Division. He testified that he had never been given any information by Mr. Reynolds or Mr. Kirst concerning any agreement with the respondents, such as is alleged to have existed in this case, until Mr. Kirst was served with a grand jury subpoena; that at that time Mr. Kirst "advised me that he had been served and I asked him what there was to this. He said, 'well, there was some understanding among the contractors at some of these lettings.' We did not go into detail"; that Mr. Kirst was immediately instructed that there was to be "no more of anything of that type."

Samuel Rees III, a CPA of Kansas City, identified and explained Exhibit 105 which was an audit of bridge jobs sold by Reynolds from January 1, 1954, to August 1962. That exhibit disclosed that during the limitation period here involved Reynolds lost $15,343 on the bridge jobs it sold for Missouri highways.

A. J. also offered a number of affidavits executed by its officers and such were admitted in evidence but we deem it unnecessary to extend this opinion by stating the contents of those affidavits.

Havens Structural Steel of Kansas City, Missouri, presented as its first witness its office manager and comptroller, Albert M. Svaglic. He tesified that Mr. Kraner handled the sales of fabricated steel for bridge construction on Missouri highway projects from the middle of 1957 until May of 1959; that Harry McEwen succeeded Kraner in 1959 and continued in that work until he retired in October 1961; that because of transportation costs Havens was more competitive in an area consisting of approximately the western third of the state and, to a large extent, limited its bids to that area; that Havens is not able to fabricate bridges the size of Missouri River crossings; that during the limitation period involved in this case Havens lost $6,095 on sales of bridges for Missouri highway projects. Mr. Svaglic testified that the charges in the information in this case as relates to Havens are false.

Harry McEwen testified that he assisted Kraner at one or two lettings before Kraner was "fired" in September 1959, and succeeded him in that work. He further testified as follows: "Q Did Mr. Kraner ever advise you at this time that he was a party to any allocation system? A No. Q Did he show you any map that had a line drawn down it? A He did not. Q Did he state he had any deals with the competitors to quote phony or fictitious bids? A No. Q Were you trying to get business for the Havens Company at those lettings? A That's right. Q As far as you know, was Mr. Kraner? A So far as I know, he was. Q Did anyone instruct you prior to attending these lettings you should not bid east of any certain area? A No. Q Did anyone instruct you that you should contact your competitors prior to attending these lettings with Mr. Kraner? A No."

This witness further stated that he tried to get the jobs closer to the plant as the company was most competitive in that area because of delivery costs; that he never contacted competitors to ascertain what bridges to bid on or the price to quote. He also testified to the following: "Q Did

you ever discuss bridge projects or prices with them in Kansas City, in Jefferson City, or anywhere else? A No. Q Did you have any agreement or understanding with any of them with respect to allocation of bridges? A None whatever. Q Who did you report to at the Havens Company? Who was your superior? A To Fred Havens. Q Did Fred Havens ever instruct you to contact competitors prior to bidding on any state bridge projects? A No. Q Did Mr. Havens ever instruct you not to bid east of the black line shown on State's Exhibit 25? A He did not. Q Did you in fact bid east of that line on occasions? A I did." Mr. McEwen related that he bid on 16 jobs east of the alleged line between December 1959 and March 1961; that he quit going to the highway lettings in the spring of 1961 and was succeeded in that work by a Mr. Morrisey. He also testified to the following: "Q Did you at all times submit what you conceived to be fair, honest, competitive bids on such bridge projects? A That's right. Q At any time while you were attending bridge lettings and submitting price quotations to prime contractors for the Havens Company, were you ever a party to any bridge allocation or bid rigging scheme? A None whatever. Q Have you read the allegations of paragraphs 9, 10, 11, 12 and 13 of the information in this proceeding? A I have. Q To your best knowledge, information, and belief, are these allegations true or false with respect to the Havens Structural Steel Company? A They are false."

The relator offered three witnesses in rebuttal but that testimony was of such a nature that we consider it unnecessary to detail it herein.

■ We will first consider the law of the case. There would appear to be no question but that proof of the allegations of the information, i. e., that respondents were members of a conspiracy which agreed to control the price of fabricated steel by allocation of territory and control of prices

quoted were sufficient, if proved, to show a violation of the Missouri anti-trust statutes. See State on inf. of Dalton v. Miles Laboratories, Inc., 365 Mo. 350, 282 S.W.2d 564, and State ex rel. Sager v. Polar Wave Ice & Fuel Co., 259 Mo. 578, 169 S.W. 126, and cases cited therein.

As we have heretofore indicated, the three-year statute is applicable in this case and hence the limitation period began on July 18, 1959. The parties are not in agreement, however, as to what must be proved within the statutory period. The respondents contend that "the Relator, in order to prevail against any of the Respondents, must prove not only (1) the existence, between July 18, 1959, and July 18, 1962, of a conspiracy to violate one or more sections of the anti-trust laws of the State of Missouri, but also (2) the commission within such period by one of the parties to such conspiracy of an 'overt act' done to effect the purpose or object of such conspiracy." Relator says that "to be successful in this proceeding he must prove two propositions by clear and satisfactory evidence: First— Respondents formed and/or participated in an unlawful conspiracy in violation of the anti-trust laws of the State of Missouri; and Second—the commission of an overt act in furtherance of that conspiracy within the three-year statutory period immediately preceding the filing of this Information."

It will be noted that the disagreement relates to the necessity of proving the existence of the conspiracy during the limitation period. In that connection we have stated that "[s]uch limitation, however, does not have reference to the day of the making and entering into the illegal conspiracy, but to the date of the last proven overt act under such conspiracy, regardless of the date at which the original illegal agreement was made." State ex inf. Major v. Arkansas Lumber Co., 260 Mo. 212, 169 S.W. 145, 170. In the Miles case, supra, we said that "the applicable limitation prescribed by Section 516.170 does not refer to the date of entry into the forbidden agreement or understanding but rather to

the date of the last proven act thereunder." 282 S.W.2d 572.

It would appear that the dispute which we are considering is more one of semantics than of substance. This for the reason that proof of an overt act would necessarily support an inference as to continued existence of a prior conspiracy. In any event, since we have assumed the existence of a conspiracy prior to July 18, 1959, we rule that it was only necessary for relator to prove an "overt act" in furtherance of that conspiracy, within the limitation period, in order to prevail herein. The term "overt act" as used in this case is something apart from a conspiracy and may be defined as an act which must accompany or follow the agreement and must be done in furtherance of, and designed to carry out, the purpose or object of a conspiracy.

We will next consider the extent of the burden of proof relator must sustain. This court has heretofore stated that violations such as those here charged "must be established by clear and convincing evidence and that clear and convincing evidence must certainly be more substantial evidence than that which is only sufficient to submit a case for the consideration of a jury. There must be substantial evidence of a kind and character which is clear and convincing as to the existence of the ultimate fact to be proved." State ex rel. Taylor v. Anderson, 363 Mo. 884, 254 S.W.2d 609, 615. One reason for such a strict requirement concerning proof is "that offenses such as are here charged savor of crime, and the judgments sought thereon should be rendered only upon clear and convincing proof." State ex inf. Barker v. Armour Packing Co., 265 Mo. 121, 176 S.W. 382, 388.

Our commissioner found that any conspiracy that may have existed had been terminated and abandoned prior to July 18, 1959. He concluded that there was no convincing proof of any overt act or of the existence and operation of a conspiracy during the statutory period. The question arises as to the weight and effect to be given the findings and conclusions of the commissioner. Relator has cited the Arkansas Lumber case in which this court stated: "Taking these views as to the powers and duties of the commissioner, it will be seen that all of the rulings made by him upon the law and the evidence, as also the findings made by him upon the facts, are subject to complete, full, and ample review by this court * * *. The case is here for our weighing upon the law, and for our examination upon the evidence, as we may find it to be from the record, reserving the right to be persuaded, if we be so inclined, by the learned commissioner's finding upon the facts, and to be swayed, if we deem his position sound, by his conclusions upon the law." 169 S.W. 164, 165. Respondents have cited In re Parkinson, 344 Mo. 715, 128 S.W.2d 1023, in which we stated that "[t]he findings of fact of a special commissioner are not binding, but are persuasive [State ex inf. v. Arkansas Lumber Co., 260 Mo. 212, 169 S.W. 145], or, as said in State ex inf. v. Kansas City College of Medicine & Surgery, 315 Mo. 101, 285 S.W. 980, 983, 46 A.L.R. 1472, 'the conclusions of the commissioner are not binding on this court, but they are advisory and helpful.'" 128 S.W.2d 1037. We conclude that it is our duty to make a full and complete review of the testimony and to reach our own conclusions as to the law and facts. We may, however, consider the persuasive effect of the commissioner's findings and, if we see fit, defer to his findings of fact based upon conflicting testimony.

We have concluded that relator has failed to prove by clear and convincing evidence any overt act in furtherance of the conspiracy during the limitation period. The most that may be said for relator's case is that it probably was sufficiently substantial so that it could be characterized as a "submissible case" in accordance with the meaning of that phrase as it is used in jury cases. A showing which constitutes only the minimum required for a "submis-

sible case," as stated in State ex rel. Taylor v. Anderson, supra, is clearly insufficient in a proceeding such as the one at bar. We are convinced that after it became known to the officers and employees of respondents (several months before July 18, 1959) that an investigation was impending the conspiracy was abandoned and ceased to operate within a very short time. In arriving at those conclusions we have not only deferred to the findings of our commissioner but our review of the testimony has caused us to independently reach the same conclusions.

In an effort to explain our decision we will first briefly review the evidence relied upon by relator as constituting proof of various overt acts. In the category of direct evidence is the testimony of DeLong, Kraner, Marti, and Kirst which we have heretofore set out in detail.

DeLong stated that at almost every letting in 1959, 1960, and 1961 Soper and Marti would urge him to "quit this fighting and work out something." That is not evidence of an existing conspiracy but, at the most, is an invitation to consider some sort of an arrangement in regard to quoting prices. Also, DeLong testified as follows: "Q (by Mr. Branton) Well, to your knowledge, Mr. DeLong, during the past three years, do you know of any occasion on which the eastern fabricators have been in the west? A No, sir. Q And do you know of any occasion on which the western fabricators have been in the eastern side of the state? A No, sir." That testimony is not direct evidence of a conspiracy but merely an effort to establish such by the fact that certain respondents sold bridges in a certain area.

Marti, at one place in his testimony, stated that he continued the cooperative bidding policy "probably until late 1959." That was obviously an error. We think it is clear from his entire testimony and other evidence that all direct cooperation stopped at the time of the restaurant meeting in January 1959. Marti did say that he oper-

ated under some general arrangement with Stupp Brothers that he should bid in northeast Missouri and Stupp Brothers elsewhere for "four or five months" after the restaurant meeting but that would not extend into the limitation period. When asked about the observance of the "line" Marti stated that to his knowledge "the practice was generally observed most of the time," and that when he quit selling bridges in 1961 the line was being observed. While this testimony tends to support relator's contentions, it is obviously vague, is disputed by much of the other testimony, and fails to measure up to the requirement of clear and convincing evidence.

In our opinion the testimony of Kraner entirely fails to support relator's contentions. The last letting he attended was in May 1959. All of his testimony relates to matters occurring prior to the beginning of the limitation period.

The strongest evidence offered by relator was the testimony of Reynolds' salesman, Walter Kirst. This witness stated generally that he continued to follow the cooperative bidding procedure until served with a grand jury subpoena May 18, 1960. He also testified that three Greene County bridges were allotted to Reynolds in January 1960 but that Reynolds could not meet the price quoted by a competitor. In that circumstance he consented that Stupp Brothers bid for and obtain the job. These bridges were west of the "line." While Kirst testified to the conclusion that the bridges had been allotted to him, we think it is significant that the job was finally sold by an eastern fabricator, apparently without any consent from Mr. Boyd who was supposed to control that territory. We think it is also significant that the only bridge Reynolds sold between July 18, 1959 and May 18, 1960, was one in Barton County and Kirst did not specifically testify that it had been allocated to him. It should also be noted that this witness testified that Reynolds sold a bridge in Harrison County which had not been allocated to it and that there were times when a bridge would not be allocated to any fab-

ricator. We also note the indefinite nature of Kirst's statement to his superior officer, after receiving the grand jury subpoena, to the effect that "there was some understanding among the contractors at some of these lettings." While the testimony of Mr. Kirst has some substantiality and tends to prove an overt act, when considered as a whole and in connection with other evidence, we do not find it to be clear and convincing.

Relator relies heavily upon circumstantial evidence to prove the continuance of the conspiracy after July 18, 1959. He points to the fact that in the vast majority of instances the eastern fabricators made their highway bridge sales in the territory east of the line and the western fabricators sold their bridges west of the line, and that such was the situation after, as well as before, July 18, 1959. We do not attach much weight to that evidence. That circumstance is explained to some extent by the evidence that because of transportation expense any fabricator is more competitive in the area close to its plant. It was shown that many fabricators other than respondents sold most of their bridge jobs in the area near their plant. Moreover, assuming that a conspiracy existed prior to the limitation period, we think it is natural that respondents would likely continue doing business in approximately the same area as they did before, even though they may have abandoned the conspiracy prior to the commencement of said period. The circumstance we are here considering certainly does not tend to prove an overt act and we do not consider it persuasive as proof of the continuance of the conspiracy after July 18, 1959.

Relator also states in his brief that "perhaps the most powerful bit of circumstantial evidence in this case is the fact that neither Erwin Stupp, John Thomsen or Rex Fossnight of Stupp, nor John Boyd of K. C. Structural, nor Fred Havens of Havens, nor Charles Soper of St. Joseph Steel were called by Respondents to testify, although each was available and although Relator's evidence directly involved each of them by

name in the conspiracy." We agree that under ordinary circumstances the failure of respondents to call officers and employees shown to have knowledge of the facts would create an inference that their testimony would have been unfavorable. In that connection it should be noted that Erwin Stupp and John Thomsen were shown to have been ill at the time of the hearings. Furthermore, respondents explain that the witnesses named, with insignificant exceptions, were mentioned only in connection with transactions occurring before July 18, 1959. It was shown in evidence that there are damage suits pending against respondents in which various parties seek to recover an aggregate of approximately $25,000,000. Those cases appear to involve issues similar to those in this case and it is likely that different statutes of limitations are applicable. For those reasons respondents admittedly sought to avoid, as much as possible, the presentation of evidence on the issue of the existence of a conspiracy before July 18, 1959. Moreover, unlike the situation in the cited case of Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, each of the respondents (except A. J. Industries, Inc.) presented as witnesses one or more of its responsible officials having knowledge concerning the facts at issue. Under the particular circumstances of this case we do not think the inference created by the failure of respondents to call the named witnesses is sufficient (even when considered in conjunction with relator's other evidence) to sustain relator's burden of proving an overt act by clear and convincing evidence.

To this point we have confined our discussion largely to evidence favorable to relator. Before concluding this opinion we deem it appropriate to mention certain facts and circumstances in evidence which weigh heavily in favor of the respondents.

It has been established that a request was communicated to the federal government for an investigation of the matters here in issue in December 1958. Direct undisputed testimony has been presented by most of

respondents that they knew of the impending investigation in late 1958 or early 1959. We find as a fact that all of the respondents (except perhaps A. J. Industries), as well as Wilmar and Illinois Steel, knew of the proposed investigation at least several months before July 18, 1959. There is nothing in the evidence to indicate that the officers and employees of the companies involved were other than normal, intelligent people. In that situation it is completely contrary to all human experience that they would continue the existence and operation of an unlawful conspiracy after they knew that an investigation of their conduct would likely be made by the United States anti-trust division, an agency possessing almost unlimited investigative resources. We are convinced as to the truth of the testimony of the officials and employees of respondents who stated that, upon learning the aforementioned facts, they instructed their salesmen not only to refrain from unlawful acts but to avoid any conduct which would lend any appearance of support to the accusations. The sole fact that the entire period of limitation elapsed after respondents had knowledge of the foregoing facts makes it difficult for us to believe that they are guilty of continuing the conspiracy or committing an overt act thereunder after July 18, 1959.

We are also impressed by the evidence that each respondent lost, in the aggregate, a substantial sum of money on its highway bridge jobs during the limitation period. That evidence effectively refutes (as to the limitation period) the allegation in the information that the conduct of respondents resulted in causing contractors to pay unreasonably high prices for bridges and unreasonably increased the cost of bridges to the State of Missouri. We, of course, agree with the contention of relator that he is not required to prove that respondents succeeded in realizing a profit from the operation of the alleged conspiracy in order to prevail herein. State ex rel. Barrett v. Boeckeler Lumber Co., 301 Mo. 445, 256 S.W. 175 [2]. However, it is conceded that the object of the alleged conspiracy was to enable respondents to sell highway bridges at a price which would permit them to realize a profit. The fact that they sustained a loss rather than a profit during that period tends to support respondents' contention that no conspiracy was in operation. The results mentioned prove, almost conclusively, that intense competition existed during that period. Competition and conspiracy are not ordinarily co-existent in a situation such as was alleged to exist in this case. Moreover, the fact that most of the respondents made an aggregate profit on highway bridge jobs for a number of years prior to 1959, and sustained a loss thereafter, tends to support the conclusion that the conspiracy was abandoned prior to the commencement of the limitation period.

In arriving at our conclusions herein we have considered the fact that respondents presented as witnesses a number of officers and employees (including bridge salesmen) who have expressly denied the allegations of the information. They have also specifically denied that there had been any "bid rigging," or division of territory for bidding purposes, or the existence of other elements of the conspiracy charged. Although they may be described as interested witnesses we do not think their testimony should be completely disregarded. We have given it such weight as we consider proper under the circumstances.

In accordance with the views heretofore expressed, we rule that relator has failed to prove by clear and convincing evidence the commission by respondents of an overt act in furtherance of a conspiracy to violate the anti-trust laws of this state, in the respects here charged, during the three-year statutory period of limitations.

Judgment of forfeiture is denied. The information is dismissed and respondents ordered discharged.

EAGER, C. J., LEEDY, DALTON, HYDE, JJ., and STONE, Sp. J., concur.

STORCKMAN and HENLEY, JJ., not sitting.